THE PEOPLE v. THOMAS HARE.

*Murder—Complaint—Objections to information—Experts—Impeachment of State's evidence—Alibi.*

1. A complaint for murder is sufficient if its allegations are positive and there is nothing to show that there was no examination of witnesses under oath before the warrant issued.

2. The examination upon a complaint before a justice for murder, need not be reduced to writing. Its purpose is only to aid in ascertaining the probabilities as to the commission of the offense.

3. The sufficiency of an examination before a justice to sustain an information cannot be challenged for the first time after the examination is returned, if the commission of the offense was positively sworn to in the complaint.

4. Where one examining magistrate invites another to sit with him in an examination upon a complaint, an information based on such examination will not be quashed for the omission of the latter to act with the former in issuing process, so long as it does not appear that the former associated the latter with him for that purpose, and that the latter therefore had jurisdiction to act. How. Stat. § 9477.

5. What caused a wound testified to in a prosecution for murder is an improper question to put to an expert, though it would be proper *to*

| 57 | 505 |
| 60 | 302 |
| 57 | 505 |
| 69 | 415 |
| 69 | 473 |
| 69 | 475 |
| 57 | 505 |
| 84 | 10 |
| 57 | 505 |
| 86 | 411 |
| 57 | 505 |
| 97 | 490 |
| 57 | 505 |
| 98 | 33 |
| 57 | 505 |
| 105 | 163 |
| 57 | 505 |
| 119 | 398 |

ask him what might have caused it. The fact is for the jury and is not mere matter of opinion.

6. On a prosecution for the murder of a person whose body was found in the water with a gash in it, a properly qualified physician may be asked his opinion on the basis of his examination of the body, or of evidence in the case, as to whether the wound was inflicted before or after death; or whether the victim was drowned; and as to the effects of a pressure on the wind-pipe or other facts covered by hypotheses supported by evidence

7. The order of proof is within the court's discretion.

8. A question warranted by cross-examination may be asked on re-direct examination.

9. Where testimony has been admitted without objection for the purpose of impeachment it is for the jury to say whether it contradicted the witness, and not for the judge.

10. A trial judge should not intimate his view of testimony on admitting it; nor should he reflect upon the veracity of the witness by such a remark as that he will probably swear so-and-so anyway.

11. Respondent's counsel in seeking to show an alibi, and to discredit a witness who has turned State's evidence, may properly examine their client as to his conversation with various persons at a time and place to which the other witness' attention has been directed, and which would have been inconsistent with guilt.

12. It is error in a criminal case to exclude testimony that will tend directly to weaken or strengthen the case made by the evidence on either side; as, *e. g.*, testimony tending to establish an alibi and discredit State's evidence.

13. It is proper to show in a criminal case that a witness who has turned State's evidence was a confederate of respondent and that no information has been filed against him, as these facts bear on his credibility.

14. The credibility of one who has turned State's evidence against an accomplice is for the jury to determine; and the court should not do more than call their attention to the nature of such testimony and the motives and temptations that may affect such witnesses.

15. There is no error in refusing instructions that are covered by the charge.

16. The People are bound in a criminal prosecution by the testimony on which the theory of their case rests.

17. The defense of an alibi is as legitimate as any other, and the witnesses who testify to it are entitled to like credit with others.

18. The jury in a murder case should acquit if they cannot all agree, beyond a reasonable doubt, that respondent was guilty as claimed by the prosecution.

Exceptions before judgment, from Berrien. (A. J. Smith, J.) April 22–3.—September 29.

INFORMATION for murder. Respondent was convicted. Verdict set aside.

Attorney General *Moses Taggart* for the People.

*Spafford Tryon, L. C. Fyfe* and *George S. Clapp* for respondent. A criminal examination before a justice takes the place of a presentment by the grand jury, and the statute under which it is conducted must be followed strictly : *Yaner v. People* 34 Mich. 286 ; *Turner v. People* 33 Mich. 373 ; *Annis v. People* 13 Mich. 511 ; permissive terms in a statute for the public good may be construed as imperative : *People v. Supervisors of Otsego County* 51 N. Y. 401; *Supervisors v. United States* 4 Wall. 436 ; *Galena v. Amy* 5 Wall. 705 ; *Mayor v. Furze* 3 Hill 612 ; *People v. Haws* 34 Barb. 69 ; Cooley on Taxation 214 ; where a power is to be exercised by several persons, all must confer and a majority decide : *Downing v. Rugar* 21 Wend. 178 ; *Powell v. Tuttle* 3 N. Y. 396 ; *Ex parte Rogers* 7 Cow. 526 ; *Green v. Miller* 6 Johns. 39 ; *Soens v. Racine* 10 Wis. 271 ; *Keeler v. Frost* 22 Barb. 400 ; *Johnson v. Dodd* 56 N. Y. 76 ; *Oakley v. Aspinwall* 3 N. Y. 564 ; *People v. Williams* 36 N. Y. 441 ; . one expert cannot determine the truth of the testimony of another : *Hitchcock v. Burgett* 38 Mich. 501 ; *White v. Bailey* 10 Mich. 162 ; *Underwood v. Waldron* 33 Mich. 235 ; *People v. Lake* 12 N. Y. 358 ; *Carpenter v. Blake* 2 Lansing 208 ; *Hoard v. Peck* 56 Barb. 202.

SHERWOOD J. The respondent, Thomas Hare, and one Daniel Billington, were jointly complained of before Alonzo Plummer, a justice of the peace at Benton Harbor, for the murder of John McCrone, at the township of Benton, in Berrien county, on the 6th day of October, 1883. The complaint was made on the 29th day of December, 1883, by Isabella McCrone, the wife of the deceased. Warrant was issued the same day for the arrest of the defendants, and thereunder Hare was arrested on the 31st of December, and

Billington, January 5th following, 1884. On January 7th the defendants were taken into court, and on their motion the case was continued until the 16th of January, at which time the case was again adjourned to the 7th of February, at Kellogg's Hall, in the city of Niles, and the record then says: .

"By request, William J. Gilbert, a justice of the peace of Niles township, appeared to sit during the further hearing of said cause.

February 7, 1884. Cause called at adjourned hour at Niles, in said county. Parties in court, with their attorneys: James A. Kellogg, prosecuting attorney, and N. A. Hamilton, counsel for the people; and Law C. Fyfe and S. Tryon, attorneys for defendant Hare, and Mr. Tabor, attorney for defendant Billington. After hearing the evidence, the court finds that said offense has been committed, and that there is probable cause to believe, and the court does believe, said defendants to be guilty of the commission thereof. The court therefore requests said defendants, without bail, to appear before the circuit court for the county of Berrien, on the first day of the next term thereof, and thence from day to day to answer to any indictment, information, or complaint that may be filed against them.

ALONZO PLUMMER, Justice of the Peace."

The complaint commences, "The complaint and examination on oath and in writing of Isabella McCrone taken and made before me, Alonzo Plummer, justice of the peace of the township of Benton, in and for said county," etc.; continuing in the usual form. Both justices signed warrant of commitment. The information in the case was filed on the 14th day of April, 1884. And on the same day a motion was entered and made to quash the information filed in the case by counsel for defendant, and the same day denied by the circuit judge.

The motion is as follows:

"Now comes the defendant Thomas Hare, and moves the court to quash the information filed in this cause by him, the said defendant Thomas Hare, for reasons following: That when the complainant, Isabella McCrone, swore to said complaint she had no personal knowledge of the charge therein

made, and had no knowledge of the facts therein contained, but that she made the same simply upon information derived from third persons; that there was no such examination as the statute requires, and that the justice, Alonzo Plummer, acquired no jurisdiction to issue said warrant, or to hold the examination for the said offense; that the said defendant Thomas Hare has never had the examinations to which, under the statute, he is entitled, before any information can be filed against him. *Second*, that said arrest of the said defendant Thomas Hare was without lawful right, and void, because it deprives the defendant of his liberty without due process of law, and against the law, which requires that no warrant shall issue without probable cause. *Third*, there has been no determination and finding by the examining magistrate, Alonzo Plummer, and William J. Gilbert, associate examining magistrate, as the statute requires, as to there being probable cause to believe the defendant guilty of the offense charged.

L. C. FYFE,

SPAFFORD TRYON,

Attorneys for defendant Thomas Hare."

It is alleged as error that the court denied this motion, and compelled the defendant to go to trial. The respondent was permitted to withdraw his plea of not guilty for the purpose of enabling him to make this motion.

We think the complaint in this case was sufficient to give the court jurisdiction. The allegations are positive as to the offense committed, and it does not appear there was no examination of witnesses under oath before the warrant issued, and it was not necessary to reduce such examination to writing. Such examination is taken only for the purpose of aiding the court in ascertaining the probability that the offense has been committed. *People v. Lynch* 29 Mich. 274.

The objection made upon the first ground comes too late, after the examination has been had and returned, where the commission of the offense is positively sworn to in the complaint. *People v. Dowd* 44 Mich. 488. The record shows that an examination was had before the magistrate Plummer, and that justice Gilbert sat with him a portion of the time the case was under investigation; that the justice who issued

the warrant determined before he issued it, that there was probable cause for his so doing; and we do not agree with counsel for the defendant that there has been no legal finding by the justice of probable cause to believe that the defendant committed the offense charged.

It is claimed under the third ground for the motion that Justice Plummer associated with him, before entering upon the examination, Justice Gilbert, for the purpose of hearing the case with him, and that upon the close of the examination Gilbert took no part in the subsequent proceedings; and counsel relies upon How. Stat. § 9477, to sustain him in the claim made in his motion. The section reads as follows: "Any magistrate, to whom complaint is made, may associate with himself one or more other magistrates of the same county, and they may together execute the powers and duties conferred upon such magistrates; but no fees shall be taxed for such associates." The only evidence that is claimed to show that Plummer associated Gilbert with him, or intended to, under the statute, appears in the clause above quoted, and, it will be seen, who requested Justice Gilbert to sit, or for what purpose he sat, does not appear in the statement made upon the record by Justice Plummer; neither do counsel for the respective parties appear to be agreed upon that subject. It is claimed by counsel for the defendant it was for the purpose of taking a part in the deliberation of the court under the statute, and by two of the attorneys for the People, Mr. Kellogg and Mr. Edwards, that it was only for the purpose of assisting Justice Plummer in taking down the testimony given upon the examination. Justice Gilbert could act under the statute only upon the request of the magistrate, and his jurisdiction so to do should appear in some way upon the record, which we do not find. The record, therefore, rather supports the position taken by the attorneys for the People. It can, however, make little difference by whom the request was made, so long as there is no proper evidence of the purpose for which it was made. The motion was correctly denied. It does not appear objection was made to the examination, nor to the manner in which it was conducted. Tech-

nical nicety in all these preliminary proceedings should, as much as possible, be avoided and discouraged. It is not in that spirit the law was intended to be administered, either in civil or criminal proceedings. The cause of justice is seldom promoted by it, while great embarrassments in civil, and much delay in the apprehension and conviction in criminal cases, is often promoted. The defendant took a separate trial, and was convicted of manslaughter.

On the trial the prosecution, by Billington, gave evidence tending to show that on the night of the 5th of October, he and defendant Hare left the fair ground where a county fair was being held, and went to the village of Benton Harbor; that they were, during the greater part of the evening, until late, in a place known as Collins' saloon; that during the evening, and at a time when all the business houses were closed, Hare and Billington stepped outside the saloon, and while there McCrone came by, when some words were interchanged between McCrone and Hare; that McCrone continued in a northerly course along the street, and at a point where the street varies from a direct course he kept on into the middle of it, and there, Hare having followed, came up to him, and struck him from behind, when McCrone turned and grappled with Hare, and Hare struck him, when McCrone said, "My God, I am stabbed," and they together sank to the ground and there remained a short time, when Billington pulled Hare away from McCrone, and it was then discovered that McCrone was dead. Hare and Billington together then carried the body to the canal and threw it into the water, where it was found on the 13th of the same month; that Hare and Billington then went to Collins' saloon, and from there to the stable where their horse and vehicle, a two-wheeled cart was, and getting it went to St. Joseph, to the house of Hare's mother (a boarding-house), and remained during the night, had a late breakfast the morning following, prepared and served by a girl named Jennie Lawton; that during the forenoon Billington got ready the cart, and about eleven o'clock they started and drove to the home of Billington's mother, near Dowagiac, some twenty-seven miles

distant, arriving in the evening, and remained during the night, and the day following (Sunday) Hare went to the place where he was working (a Mrs. Sherman's), some fifteen miles distant. The People relied upon the truthfulness of the facts stated by Billington to secure a conviction. The defense claimed that Hare and Billington left Benton Harbor at about five o'clock of the 5th, and went to Mrs. Sherman's, and remained during the night, and the following morning went to Dowagiac, and that evening came to the home of Mrs. Billington and remained during the night, and the day following Hare took his departure for the Sherman place; and upon these several theories the cause was tried.

The body of McCrone was first discovered in the water off the dock at Benton Harbor, upon the 13th day of October, A. D. 1883. Dr. George Bell testified he made an examination of the body upon that day, and on the next day an autopsy. He noticed no froth or water about the nostrils, found a bruise on the shoulder, slightly discolored, and a cut on the right hip three inches in length and a half inch in depth. The edges of the cut were clear, and apart three-fourths to one-half inch. Counsel for the People then asked the following question: "From the appearance of the wound, what would you say it was caused by?" This and a subsequent question of the same import were objected to, upon the ground that the witness could not give an opinion upon the matter. The objection was overruled.

We think the objection to this question was well taken, and clearly comes within the decisions of this Court heretofore made. The question calls for the fact which was to be found by the jury. What might have caused it would have been proper, but what did cause it was the real question for the jury. *Wilson v. People* 4 Park. Crim. R. 619, 649; *Evans v. People* 12 Mich. 35; *Moore v. State* 17 Ohio St. 521; *Hitchcock v. Burgett* 38 Mich. 506; *Van Deusen v. Newcomer* 40 Mich. 90. This question in this case became of more importance than usual, because, to maintain the People's theory, it had to be made to appear that death had

been produced by violence before the body of McCrone was placed in the water.

The following additional questions put to Dr. Bell were objected to, and the objections overruled and testimony received, viz.: " (1) From the appearance of this wound (referring to that upon the shoulder), would you say it was inflicted in his life-time, or after death? (2) From general appearances, and from these facts which you have detailed, what is your opinion whether McCrone was drowned? (3) What effect upon the individual has a violent pressure on the wind-pipe? (4) Suppose there was a pressure on the trachea sufficient to flatten it, or upon the larynx sufficient to draw it together, what would be the effect upon the individual? (5) Would he be able to cry out? (6) In what length of time would pressure cause death? (7) Would it cause insensibility? (8) And a loss of power?" The objections made to these questions were that they called for the opinion of the witness and were irrelevant. We see no objection to the rulings of the court upon these questions. There seems to have been no question made as to the doctor's qualifications as a physician, and he made a thorough examination of the body. He was present and took part in the post-mortem examination, and described with particularity the indications of violence, and wounds upon the body and its condition, and spoke from the personal examination made, as well as upon a hypothetical statement of facts, and his evidence was properly received. The testimony in the case contained sufficient facts upon which to base the hypothesis included in the questions. The order in which the testimony should be received was within the discretion of the court.

Dr. Scott, of Benton Harbor, was sworn in behalf of the People, and testified that he did not see the body of McCrone. He was asked the following questions, after testifying that he heard the testimony of Dr. Bell: (1) Did you hear Dr. Bell's description of McCrone's shoulder? (2) What would you say from the description of that wound, whether the bruise was made during life or after death? (3) Did you hear Dr. Bell's description of the wound in the side? (4)

What do you say as to that?" The witness answered he "should say that the wound was made during life." The questions were all objected to on the ground that they were irrelevant and immaterial, and "no testimony in the case to warrant the questions."

The facts which were testified to as to the appearance of the dead man do not appear to have been disputed, and Dr. Scott, assuming the facts which he heard Dr. Bell testify to, to be true, and which were not contradicted, answered the questions by giving his opinion that the physical injuries referred to were made before death. We find no error in admitting this testimony. He was not required to pass upon the credibility of the testimony. The questions called for his opinion upon a certain state of facts, and only his professional knowledge and experience were involved in the answers to be made.

The question objected to in the re-direct examination of John A. Scott was properly received; it was warranted by the cross-examination.

The defendant Hare was a farmer, and lived in Keeler, Van Buren county, about twenty miles from Benton Harbor, and Billington, who is informed against for the same crime, about       miles, at the time the offense is charged to have been committed. At the time the atrocious crime was being committed, according to the testimony of Billington, the defendant swears he was not in Benton Harbor at all, but was on his way home in Keeler, and Billington was riding with him, so that the final result of the case before the jury depended almost entirely upon the veracity of the statement of the defendant. If that was believed, the defendant could not be convicted; if discredited, and that of Billington believed, he could not and ought not to escape conviction. Such being the fact, the People's counsel made a strong effort to discredit the defendant, and great latitude was allowed the counsel in the extent and ground covered by the examination, and upon the cross-examination of Billington great vigilance characterized the efforts of the defendant's counsel in laying the ground for his impeachment. His attention

was challenged to a conversation about a horse trade claimed to have taken place between Billington and Dine on the 6th of October, in Dowagiac, for the purpose of identifying Billington's and defendant's whereabouts on that day, and the witness was asked if he did not recollect the fact and conversation. Thereupon the court stated that he "did not think the fact that he was in Dowagiac would be material, and could not have been contradicted, if it had not been that the People have seen fit to show where he was on that day. It is entirely immaterial whether he talked about a wind-broken horse or not. It will not contradict anything he swears to." This statement was excepted to by counsel for defendant. We think it went too far, and that the exception was well taken. The court permitted the testimony to be given, and it was not objected to. Whether it properly might have been given, it is not necessary now to consider. Certainly it was for the jury to say whether it contradicted anything Billington testified to or not.

When the respondent was giving his testimony his counsel sought to show that on Friday, the last day of the fair, and immediately after it closed, he made his preparations for going to his home in Keeler that night, and was asked what he said to witness Hyler about it, at a time when Billington's attention had been called to it. This was objected to by counsel for the People, and the court remarked, in making his ruling: "Take it in this particular case, perhaps it would make no difference. * * * I don't think it is legal and proper, and would be a bad precedent to cite. As far as this particular case is concerned, I don't think it would make much odds. He would probably swear that he went away anyway." We think these remarks were well calculated to give the jury an unfavorable impression of the defendant's veracity, besides intimating very clearly the court's view of the testimony admitted. This should not have been done, inadvertently as it was. We cannot say it did not prejudice the jury against the defendant. The defendant was also asked by his counsel what conversations were had between him and witnesses William Dine, Addison

Parks, Mr. Felt, John Green, Mr. Geer, Mr. Limbeck, Herbert Crane, and Mr. Hyler, at those times to which Billington's attention had been called, for the purpose of contradicting Billington. We think this should have been allowed for that purpose, and for the purpose of showing the respondent at a place on a certain time and occasion which would render it impossible for him to be in Benton Harbor, and have the alleged altercation with the deceased, McCrone, as sworn to by Billington.

Two points are made against the rulings of the court in striking out the testimony of Mrs. Lyon giving the reason why she knew that the person whose voice she heard in passing, swearing and talking, was Hare, and in not allowing her to answer the following question : " You may state what was said,"—*first*, that the testimony taken tended to impeach Billington ; and *second*, that the matter sought to be proved made certain the facts constituting the impeachment. The occasion was Friday evening, about the time Billington had testified Hare was having his altercation with McCrone in Benton Harbor which resulted in the latter's death ; and if Hare was away from there, and many miles distant from Benton Harbor, Billington's testimony could not be true ; and any fact or circumstance reasonably tending to show the degree of attention which Mrs. Lyon was giving to enable her to know that it was Hare who was passing, was both proper and important. It was the issue made by the testimony given by the defendant and Billington that became all important. It was really all there was to the case, and anything which would tend to make or fortify the testimony on either side was of the utmost importance, and should not have been rejected when offered ; and the same rule applies, and should have been applied by the court, to the testimony of witnesses Yeadis, Thomas Adams and Mrs. Belle Hare, and the rulings made by the court in each case were erroneous.

There is no reason why rules governing and relied upon by prudent and intelligent men in the transaction of the most important business of life should not be applied and

made to govern in courts of justice in the trial of causes where life has been taken, and is to be answered for, and the liberty of the accused is at stake. The basis of a rule of law or evidence cannot rightly be ignored in its application, which, I think, was done in this case by rejecting the testimony offered, above referred to. We have been more particular in calling attention to the particular instances in which we think there has been a departure from the rule of safety because of the necessity for a new trial in the case.

The court refused to allow defendant to show the fact that no information had been filed against Billington. Billington was a confessed confederate and an accomplice in the crime charged against McCrone. No conviction could have been had upon this record without his testimony, which shows him to be a man with little conscience, and less regard for truth, if the testimony of the other witnesses is to be believed. It was not only proper, but it was the duty of counsel for the prisoner to place before the jury all the circumstances surrounding the witness upon the stand, as well as any fact which would have any reasonable tendency to affect his credibility ; and the fact that he was not informed against for the crime he stood charged with, and that he was treated with the leniency usual in cases of informing accomplices who volunteer to give testimony against their confederates in crime, had its bearing upon his credibility, and we think the circuit judge erred in ruling otherwise.

The defendant's fourth, fifth, sixth, and eighth requests to charge relate to the testimony of an accomplice, and its insufficiency, unsupported, to convict. We think these requests were all properly refused. They are not in accord with the rule of this State. " The credibility of an accomplice, like that of any other witness, is exclusively a question for the jury ; and it is well settled that a jury may convict on such testimony alone," uncorroborated, and it is not error for the court to refuse to charge the jury that it is not safe to convict a defendant on the uncorroborated testimony of an accomplice, or any number of accomplices. Neither can the court instruct the jury that they are bound to accept and

credit testimony of an accomplice, either standing alone or uncorroborated. It is their province to determine whether he is to be credited at all, and if so, to what extent. There is nothing improper, however, and in many cases it is important that the court should comment upon the nature of such testimony as the circumstances may prompt, and point out the various grounds of suspicion which may attach to it, to call the jury's attention to the situation and temptation under which such witnesses may be placed, and the motives by which they may be actuated, and any other circumstances which, in the nature of the situation, may go to confirm or discredit the witness ; but further than this the court should not go. *People v. Jenness* 5 Mich. 305 ; *People v. Schweitzer* 23 Mich. 301 ; *People v. Annis* 13 Mich. 511 ; *Hamilton v. People* 29 Mich. 173 ; *People v. Lyons* 49 Mich. 78 ; *Knowles v. People* 15 Mich. 408.

The defendant's seventh request was sufficiently covered by the charge of the court, and there was no error committed in refusing to give the defendant's fourteenth, fifteenth, twenty-second, twenty-third, twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth requests. All that was proper in these to be given is found in the charge given by the court.

The defendant's tenth, eleventh, twelfth, sixteenth, seventeenth, twenty-first, and twenty-fifth requests, we think, were supported by the evidence and the course pursued by the People upon the trial, and should have been given as requested. These requests will be found in the margin.[1]

The time when Billington testified the crime was com-

---

[1](10) Inasmuch as the People rely for a conviction on the testimony of Billington, who professes to have been present at the place and saw the act done, and knows the place where, and the time when, it was done, and no other testimony appears as to the time and place, then the People are confined to the time and place which he mentions, and they are not at liberty to fix either another place or time ; which the court refused to give ; to which ruling the defendant by his counsel duly excepted.

(11) It is maintained by the defendant that Billington testifies that the killing was done before Collins' saloon was closed on the night of October 5, 1883 ; that he knows so, because he was in the saloon after the killing ; that he and Hare went from the canal, where they had put the body, and went into the saloon, which was yet open, with a dozen people therein, and that it still was open when they left it ; which the court

mitted, he refers to a fact well known to others, and which appears in the case, upon the testimony of others, and without controversy or dispute. It was before the closing of Collins' saloon, and the People must be held bound by the testimony of Billington, because the only proof of the striking of the fatal blow by Hare is that given by their own witness, upon whose testimony the whole theory for conviction rests.

The charge given by the court upon the defense of the alibi in the case, we think, clearly indicates the necessity for giving the seventeenth request, and we see no impropriety in giving the twenty-fifth request. It is unquestionably the fact that a person frequently yields to the importunities of his associates, against his convictions of what he believes to be right, in his desire to come to an agreement in the case ; and especially is this the case with young and inexperienced jurors. Probably every practicing attorney has met with this experience at the bar to a greater or less extent. It is very seldom that the jurors are sufficiently instructed by the trial judge upon this and other points that might be mentioned in the discharge of their duties, and if the court fails so to do upon his own motion in an important case like this, where the parties are entitled to a verdict, the result of the careful and intelligent investigation and honest conviction of each of the twelve, we see no reason why the defendant, by his counsel, should not ask the court in the charge to especially call their attention to the subject, and when so requested, it is the duty of the court to comply with the request, if made in good faith, as we have no doubt it was in this case.

refused to give, and the defendant by his counsel then and there duly excepted. If you find that Billington has so testified here in this case, and that he puts the killing before Collins' saloon was closed, then I advise you that you cannot legally convict the defendant, unless you find that McCrone was in fact actually killed and dead before Collins' saloon was closed ; which instruction and request the court refused to give; to which ruling the defendant by his counsel duly excepted.

(12) I advise you that you ought not to convict the defendant if you believe that McCrone was alive after Collins' saloon was closed for the night on October 5, 1883,—the night when it is claimed that McCrone was killed ; which the court refused to give ; to which ruling the defendant by his counsel duly excepted.

(16) If you believe the testimony of Mrs. Lyon and the other witnesses

We have carefully examined all the alleged errors and exceptions taken in this case, numbering about one hundred, and fifty, aimed at the various proceedings had therein, and have considered herein only such as were called to our attention upon the argument of counsel upon the hearing, and which we find raises all the important questions. The case presents many difficulties, and is peculiar in many of its features and circumstances. It was closely tried at the circuit by counsel, and while we have felt it our duty to disagree with many of the rulings of the circuit judge, the record shows much care and anxiety on his part to secure a correct result. The view we have taken of the case renders a new trial necessary, and

The verdict must be set aside for that purpose.

Cooley, C. J. and Campbell, J. concurred.

---

who testify to having seen Hare on the road from Benton Harbor to Mrs. Sherman's on Friday night, the fifth day of October last, then you ought to acquit the defendant; which request and instruction was refused by the court, saying, "This part is covered by my direct charge;" to which refusal defendant duly excepted.

(17) The defense of an *alibi*, as it is called, is as legitimate a defense as any other defense. You are to give the same credit to witnesses who testify concerning it as to those who testify to anything else. [Covered by balance of charge.] If you believe it to have been established, then you are bound to acquit the defendant. The circuit judge refused to give to the jury such instruction, as requested; to which refusal the defendant did then and there duly except.

(21) It is your duty to come to an entire agreement as to whether the killing of McCrone was before Collins' saloon was closed. You are not at liberty to convict the defendant, part of you believing that he was killed before, and part of you believing that he was killed after, the saloon was closed. If you cannot all agree that McCrone was killed before Collins' saloon was closed, then you should acquit the respondent; which the court refused to give; to which ruling the defendant by his counsel duly excepted.

(25) The jury are instructed that in their deliberating, if any one or more of their number, after consulting with their fellow jurymen, retains a reasonable doubt of the defendant's guilt, the jury should not find him guilty; which instruction, so prayed for, the court refused to give, saying, "I am not to charge individual members of the jury;" to which ruling the defendant by his counsel did duly except.