## The People v. James G. Clarke.

*Criminal law—Misconduct of election officers—Information—Duplicity—Evidence—Confessions—Instructions to jury.*

1. An information under How. Stat. § 9367, which provides that "if any officer on whom any duty is enjoined by law relative to general, special, township, or charter elections, or the canvassing or return of votes given at any election, shall be guilty of any willful neglect of such duty, *or* of any corrupt conduct in the execution of the same, he shall, on conviction thereof, be deemed guilty of a misdemeanor," etc., charging that the respondent, "while a member of the board of county canvassers, was guilty of willful neglect of duty *and* of corrupt conduct in the execution of his duty enjoined by law upon him as a member of said board," is not bad for duplicity, the reference being to a single transaction.

2. In a prosecution for fraudulently altering the figures in a tabulated sheet containing the votes cast for and against a certain constitutional amendment, the testimony traced the book in which said tabulated sheet had been placed to a room in an hotel where it had been left temporarily by the legal custodian, and clearly showed that the sheet had been taken from said book in said room by some unknown person, and had not since been seen by the officer in whose custody it had up to that time been, and who was charged by law with its custody. And it is held that an objection to the admission of testimony as to the contents of said tabulated sheet, on the ground that it was secondary evidence, is without force.

3. Respondent objected to the admission in evidence of a statement made by him to the prosecuting attorney while in custody, and taken down by a stenographer, on the ground that it was made in the course of the preliminary examination,

and, under the statute,[1] was inadmissible. An extended colloquy followed between the court and the counsel for the respective parties as to the circumstances under which the statement was made, during which the respondent's counsel made the further claim that the statement was involuntary. The statements made during the colloquy were unchallenged by the respondent, and tended to negative both of his claims, and he offered no testimony upon the subject. And it is held that, under the rule laid down in *People v. Barker*, 60 Mich. 277, the objections were properly overruled.

4. The testimony of the respondent tended to show that said statement was secured by means of undue influence exercised over him by the prosecuting attorney, or by reason of inducements held out to him by that officer, and the court was requested to instruct the jury that a confession so obtained is involuntary. The court refused to give said instruction, and did not in his general charge submit to the consideration of the jury the questions so presented. And it is held that the requests should have been given.

5. A charge in which the salient points of the testimony for the people, the witnesses being referred to by name, are brought out, and in which equal consideration is not given to the testimony for the respondent, is open to criticism. If the testimony is to be contrasted by the court, it must clearly appear that it has been done without prejudice; citing *People v. Murray*, 72 Mich. 10.

Error to recorder's court of Detroit. (Chapin, J.) Argued February 28, 1895. Decided April 30, 1895.

Respondent was convicted of willful neglect of duty and corrupt conduct in the execution of his duty in canvassing election returns. Reversed. The facts are stated in the opinion.

*William Look, Thomas J. Navin,* and *Joseph M. Weiss* (*Ira G. Humphrey* and *Edward Minock,* of counsel), for respondent.

*Allan H. Frazer,* Prosecuting Attorney, and *Ormond F. Hunt,* Assistant Prosecuting Attorney, for the people.

---

[1] See foot-note, page 171.

McGrath, C. J.  Respondent was charged, under section 9367, How. Stat., with willful neglect of duty and corrupt conduct in the execution of his duty in canvassing election returns.

The information alleges that respondent "was guilty of willful neglect of duty and of corrupt conduct in the execution of his duty," etc.  The statute provides that if any officer "shall be guilty of any willful neglect of such duty, or of any corrupt conduct in the execution of the same," etc.  The information follows the language of the statute, except that the conjunctive, and not the disjunctive, is used, the reference being to a single transaction.  The objection that the information is bad for duplicity is therefore without force.

It is next insisted that the testimony relative to the tabulated sheet should have been excluded as secondary evidence.  The testimony traced the book containing the tabulated sheet to a room in a hotel at Lansing, and clearly tended to show that the sheet had been taken from the bound volume in that room by some person unknown, and had not since been seen by the party in whose custody it had up to that time been, and who was charged by law with its custody.  There is no force in the objection.

The people offered in evidence a statement made by the respondent, and reduced to writing by a stenographer. It was claimed by respondent's counsel that this statement was made in the course of the preliminary examination, and, under the act creating the police court of the city of Detroit, was inadmissible.  Charter 1893, § 661.[1]  An extended colloquy then took place between

[1] This section, being section 20 of Act No. 161, Laws of 1885, reads as follows:

"If either police justice shall have probable cause to suspect that an indictable crime, misdemeanor, or offense has been committed within the corporate limits of the city of Detroit, and that any person within the lawful jurisdiction of the process of the police court may be able to give any material evidence respecting such crime, misdemeanor, or offense, he shall have power and authority, in his discretion, to require such person to appear before him

the court and counsel as to the circumstances under which the statement was made, during which counsel for respondent made the further objection that the statement was involuntary. The statements made during the colloquy were unchallenged, and tended to negative the allegations that the admissions were made as a part of the preliminary investigation before the police justice, or that they were involuntary, and respondent's counsel offered no testimony upon either subject. Under the rule laid down in *People v. Barker*, 60 Mich. 277, no error was committed.

The respondent testified, with reference to this statement, that, when he was arrested, he was taken to the office of the prosecuting attorney, who took him into a room; that he "told me that he had conclusive evidence

as a witness, and answer upon oath such questions as shall be put to him or her touching such crime, misdemeanor, or offense, or his or her knowledge or information of the same, or of any material fact involved therein; and the proceedings to summon said witness, and to compel him or her to testify, shall, as far as practicable, be the same as proceedings to summon witnesses and compel their attendance and testimony in ordinary cases, matters, and proceedings in the police court; and if upon such inquiry the police justice shall be satisfied that such crime, misdemeanor, or offense has been committed, and that there is probable cause to suspect any particular person or persons to be guilty thereof, he may cause the apprehension of such person or persons by proper process, and upon the return of such process, served or executed, the police justice shall proceed with the case, matter, or proceeding in like manner as upon formal complaint by the injured party or other person. And in respect of communicating or divulging any statements made by such witness during the course of such examination the police justice shall be governed by the provisions of law relative to grand jurors."

How. Stat. § 9502, provides that—

"Members of the grand jury may be required by any court to testify whether the testimony of a witness examined before such jury is consistent with, or different from, the evidence given by such witness before such court; and they may also be required to disclose the testimony given before them by any person upon complaint against such person for perjury, or upon his trial for such offense; but in no case can a member of a grand jury be obliged or allowed to testify or declare in what manner he or any other member of the jury voted on any question before them, or what opinions were expressed by any juror in relation to any such question."

that I knew all about it, and that, if I had anything to say, to say it now; that, if I wanted to make a confession, I would have to make it before 12 o'clock that night, or it wouldn't go." That he was then taken to the Central police station; that—

"The next man that I saw was Dr. Frank Houp, the druggist on the corner of Sixth and Michigan avenue, an intimate friend of mine. Afterwards Dr. Houp came to the cell with the officer, and told me that I must make a confession to Mr. Frazer, and that I would have to make it before 12 o'clock; that Mr. Frazer told him I was to be without bail; that I couldn't get bail; and that I would rot on the damn planks if I didn't make a confession. He held up my family to me; told me, if I knew anything, to say it, and try and save the children and my wife. * * * After Mr. Houp left there that evening, I waited until nearly 12 o'clock, and I sent after Mr. Frazer, according to directions of Mr. Houp, his instructions to me. Mr. Frazer came down there, I think, between 11:30 and 12 o'clock. Mr. Frazer called in an attendant there,—a turnkey, or whatever you may call him. Told him to unlock the door and let me out. We went around into the back room. Mr. Frazer asked me what I had to say, and I said I didn't think I had anything to say what would be of any benefit to him on the case. He says: 'I know all about this case, and I know you put the figures on there, and, if you don't make a confession to me, you'll stay here until you rot.' I asked Mr. Frazer if I could ask him a few questions before he said anything. He said I could. I think I also said that 'you're my attorney,' laughing. I also said: 'Now, Mr. Frazer, if I don't say anything to you that would be of benefit to you, what time do I get out of here to-morrow morning?' Mr. Frazer says: 'Just as soon as I can make out the papers.' I asked how long that would be. He said: 'I don't know. It may take a little time.' I said: 'Do you think I will be out of here to-morrow?' And he said: 'I think I can get the papers made out. I will start to make them out as soon as I get home.' I said: 'Mr. Frazer, another question is, what will be the result with me in case I should say anything that will be of benefit to you?' He said: 'You ought to have confidence enough in me to know that I will take care of you.' Next morning Mr. Frazer sent an officer for me.

I suppose he did. The officer came at least. The officer didn't say anything. I supposed it was bail. I was very anxious to get out. Instead of that, it was to come to Mr. Frazer's office with an officer. I can't remember whether a stenographer was there. I think there were several reporters sitting around the table taking pictures, or something of that kind, and Mr. Green was there. Mr. Frazer called me in his private office with Mr. Green; turned around, and asked me if I wanted to talk to Mr. Green privately, and I think I nodded my head, 'Yes.' Mr. Frazer went out, and shut the door. I talked with Mr. Green a little while, perhaps five or ten minutes. Mr. Frazer came back, asked me what I found out, and I says, 'I don't know anything. Q. What does Mr. Green know? A. He doesn't know anything.' Mr. Frazer wanted to find out from me what Mr. Green knew. Then Mr. Frazer ordered the officer in again, and locked me up, and I was taken down to the Central station. I am not sure whether it was in the afternoon or the next afternoon that I was taken out. I can't say for certain. It strikes me that it was Wednesday afternoon when I was again taken to Mr. Frazer's office. I can't remember who I saw there except the assistant prosecutor (Mr. Hunt) and Mr. Frazer. It was then that I made this statement. I heard the statement read by Mr. Mandell to the jury this morning. I was just about crazy during my imprisonment and the times I was brought to Mr. Frazer's office, and was laboring under great mental excitement."

The court was requested to instruct the jury that—

"No confession is deemed to be voluntary if it appears to the judge to have been caused by any inducement, threat, or promise preceding from a person in authority, and having reference to the charge against the accused person, whether addressed to him directly or brought to his knowledge indirectly, and if such inducement, threat, or promise gave the accused person reasonable grounds for supposing that by making a confession he would gain some advantage or avoid some evil in reference to the proceedings against him. The prosecutor, officers of justice having the prisoner in custody, or magistrate are persons in authority.

"It is for the jury to determine for themselves whether the alleged confession of the defendant was made freely

and voluntarily, without any influence of hope or fear. If so, they may consider it. If not, it is no evidence."

"Any—the slightest—menace or threat, or any hope engendered or encouraged that the prisoner's·case will be lightened or more favorably dealt with if he will confess, is enough to exclude the confession thereby super-. induced; and any words spoken in the hearing of the prisoner which may, in their nature, engender such fear or hope, render it necessary that a confession made within a reasonable time afterwards shall be excluded, unless it is shown by clear and full proof that the confession was voluntarily made after all trace of hope or fear had been fully withdrawn or explained away."

The court refused to give these requests, but instructed the jury as follows:

"You remember the statement made to the prosecuting attorney, about which there has been so much discussion in this case, and you will remember the preliminary remarks by which the prosecuting attorney prefaced this statement. There is some question as to whether or not this statement was a voluntary statement. You remember the testimony of the prosecuting attorney himself, and also the testimony of Judge Whelan on that point,—that the defendant was brought to the prosecuting attorney's office; that he told him that he was not obliged to make this statement, and any statement he might make must be the absolute truth. He was not required to make it, and he was not promised any reward or leniency, threatened in any manner, or coerced into making this statement,—not promised any immunity. Now, if you believe, gentlemen of the jury, that that was a voluntary statement made by him, then you must carefully consider his evidence in this case, because he stated in his testimony, as I remember it, gentlemen, that he had no recollection of having made this statement to the prosecuting attorney, and, if he did make such statements as are set up in this statement, that it was untrue, that the statements are untrue, for at that time he says he did not know what he was doing,—I believe his own language is that he was crazy at the time. It is for you to say, gentlemen, whether or not the statement was made voluntarily, or whether he was coerced into making it; and, if you believe that he was forced to make it, then, of course, you should not consider it."

The requests presented should have been given. The instruction given did not submit to the consideration of the jury the question of undue influence in obtaining the statement or of the inducements alleged to have been held out by the prosecuting attorney. Confessions are inadmissible when induced by threats, or by a promise of favor, made by persons apparently acting by authority. *Flagg v. People,* 40 Mich. 706; *People v. Wolcott,* 51 Id. 612; *People v. Barker,* 60 Id. 277.

It is urged that the court, in charging the jury, brought out the salient points of the testimony of the people, referring to the witnesses by name, and did not give equal consideration to the testimony for the defense. We think that the criticism is not wholly groundless. The portion of the charge given is an illustration. The court refers to the testimony of the "prosecuting attorney," and to that of "Judge Whelan," that the prisoner was not required to make the statement, not promised any reward or leniency, threatened in any manner, or coerced into making the statement,—not promised any immunity. When the testimony of the respondent is referred to, the testimony which tends to negative that of the people's witnesses as to the promise of reward or immunity is not alluded to, but the court refers to a statement made by the witness relating to certain of the contents of the paper as made with reference to the entire paper. If the testimony, is to be contrasted by the court, it must clearly appear that it has been done without prejudice. *People v. Murray,* 72 Mich. 10.

The judgment is reversed, and a new trial ordered.

LONG, MONTGOMERY, and HOOKER, JJ., concurred. GRANT, J., did not sit.