PEOPLE *v.* O'HARE.

1. CRIMINAL LAW—TRIAL—REMARKS OF COURT—STRICTURES ON COUNSEL—FAILURE TO PRODUCE WITNESS.

For the court on the trial of a criminal cause to make a partisan argument to the jury upon the failure of respondent's counsel to produce as a witness a certain person who figures in the defense, and to characterise the omission as part of a scheme to fabricate a defense and sustain it by perjury, "a practice of which no lawyer fit to practice law would be guilty," is reversible error.

2. SAME—EVIDENCE—WITNESSES—REPUTATION.

On a prosecution for burglary, it was error to permit the people to attack the reputation of a witness for respondent by showing that she was known to the police as a street-walker, and that she associated with another woman of bad repute.

3. SAME—PREVIOUS ARREST—COLLATERAL ISSUE.

On a prosecution for burglary, it was error to admit evidence that one not a witness, but supposed to be an accomplice, had been arrested on another occasion.

Error to Bay; Maxwell, J.   Submitted June 12, 1900.
Decided June 26, 1900.

John O'Hare was convicted of burglary, and sentenced
to imprisonment for four years in the State prison at
Jackson.   Reversed.

*John E. Simonson*, for appellant.

*Edward E. Anneke*, Prosecuting Attorney, and *Lewis
P. Coumans*, Assistant Prosecuting Attorney, for the
people.

HOOKER, J.   The defendant was convicted of burglary,
upon a charge of breaking and entering a farmer's barn
and stealing a double harness.   The outline of the case for
the prosecution is that the barn door was found open in
the morning, and the harness gone.   The yard gate was
open, and tracks showing that a buggy had stood near by,
and afterwards gone south, were distinguishable.   The
defendant and his companions were shown to have hired a
buggy in Bay City that night, about 12 midnight.   The
harness was found in possession of one Sackles, south of
Saginaw, the next morning.   He had traded a horse for
it, the morning that it was missed, to Burkhardt and
Wines, the men who were with defendant in the buggy.
The defendant claimed that he had a slight acquaintance
with one Martin, and that, a few days before the harness
was stolen, he met Martin, who told him that he had a
harness to sell.   Defendant had no use for the harness,
and the subject dropped.   On July 9th defendant met
Wines, who told him of a man who would trade a horse
for a harness, and defendant mentioned his talk with
Martin.   On July 12th defendant again saw Martin, who
agreed to bring the harness to Burkhardt's barber shop for
inspection that evening, which he did about 10 o'clock.
Defendant paid Martin $10 for it, $3 of which he borrowed
from Burkhardt, and $2 from a young woman named
Hattie Smith.   The horse and buggy were then hired,

and used for the purpose of getting and taking the harness to Saginaw county, where it was traded for the horse. Wines was taken because he alone knew where to find the man with whom they were to trade. This horse was afterwards sold to Boutell.

Burkhardt, who had been previously convicted, was sworn, and testified to the facts claimed by the defense. Martin was not called by the defense. During the examination of Burkhardt, the following colloquy occurred:

"*The Court:* You have had the services of the sheriff of the county at your disposal. Why haven't you brought this Mr. Martin here?

"*Mr. Simonson:* We have endeavored to get Mr. Martin.

"*The Court:* Why haven't you taken a subpœna for him?

"*Mr. Simonson:* We sent a man yesterday to try to find out where this Mr. Martin was, in order to get a subpœna. We took the—

"*The Court:* You haven't sent the sheriff to look for him at all. I have been so advised, and I think there is an order in the case that the witnesses be subpœnaed at the expense of the county.

"*Mr. Simonson:* We take an exception to the remarks of the court.

"*The Court:* It looks to me like an imposition on the court.

"*Mr. Simonson:* We take an exception to the remarks of the court.

"*The Court:* Take all the exceptions you are a mind to. Good faith in an attorney must be exacted in every court of justice. I cannot allow you to pick up or look after a straw man here, in order to tempt people to commit perjury.

"*Mr. Simonson:* We take an exception to the remarks of the court.

"*The Court:* If there was any such man as Mr. Martin, he can be produced or accounted for. You have had the assistance of the whole State of Michigan at your back to do it, without a cent of costs.

"*Mr. Simonson:* We take an exception to the remarks of the court.

"*The Court:* It seems to me that you are trifling with

the court, and occupying its time sillily and foolishly. Not only that, but you are encouraging the commission of a crime. If there is no such man as Martin, then the testimony is all false.

"*Mr. Simonson:* We take an exception to the remarks of the court. Shall I go on with the witness?

"*The Court:* You can do whatever you are a mind to.

"*Q.* You came back after you took Miss Smith home, and you found Mr. Daniels and O'Hare in front of your place?

"*A.* Yes.

"*Q.* What did you do then, and what conversation did you have?

"*A.* Mr. Daniels got up and leaned against a pole, and I sat down, and we were talking, and I says: 'I believe Mr. Vanderbilt has an opening at his place, and a dance. I ought to go out, as he comes to my place, but I guess I won't go; it will be too far to walk back.'

"*The Court:* Where does Martin live?

"*A.* I couldn't tell you. It seems to me that I saw the man once or twice previous to that.

"*The Court:* You told us on the other trial that he lived up at Portsmouth.

"*A.* That is what I learned from a man in the jail.

"*The Court:* You haven't taken any subpœna for him or sent the sheriff after him?

"*A.* I mentioned it to the sheriff.

"*Q.* You mentioned it to your attorney?

"*A.* Yes. That day when he came in I told Mr. Anneke about it. Mr. Anneke was the first one I mentioned it to.

"*Q.* Why didn't Mr. Simonson send for him?

"*A.* I never spoke to Mr. Simonson.

"*Q.* You knew he was a necessary and material witness?

"*A.* Certainly, we would like to have him.

"*The Court:* But you made no effort to get him?

"*A.* I couldn't do anything.

"*The Court:* You could ask the sheriff.

"*A.* I did tell the sheriff over there.

"*The Court:* Instead of getting a man that you thought, if he existed and would tell the truth, could help you out of this scrape, you saw fit, both of you, to ransack every crib and bad place there is here to get some witness that would tell a lie. It seems to me that has been the practice, instead of the legitimate practice of the law.

"*Mr. Simonson:* We take exception to the remarks of the court.

"*The Court:* I don't think a lawyer is fit to practice law that would be guilty of such a practice as that.

"*Mr. Simonson:* We take an exception to the remark of the court.

"*The Court:* You can have no exception here.

"*Mr. Simonson:* Shall I proceed with the witness?

"*The Court:* There is an order of the court assigning you to defend this man, which directed the sheriff to subpœna all of his witnesses at the expense of the county.

"*Mr. Simonson:* How could I know what Mr. Martin—

"*The Court:* You knew the importance of Mr. Martin, and that, of all things in the world, he ought to be produced.

"*Mr. Simonson:* As soon as I was appointed I directed a man to go up there, and to go to every Martin family up there, and find out who he was.

"*The Court:* Whom did you send?

"*Mr. Simonson:* John L. Averill.

"*The Court:* Why didn't you send the sheriff?

"*Mr. Simonson:* How could the sheriff go and subpœna a man until he knew whom to subpœna and where he was? Suppose I say, 'Go and get Mr. Martin.' What would he tell me? He would say, 'Who is Mr. Martin, and where does he live?'

"*The Court:* I cannot have this class of work done here, and I won't have it."

In his charge the court alluded to the subject as follows:

"Now, under this state of facts, as to that man Martin, I think the defendant was bound to produce him, or account for him, if he could. You have heard the testimony of the defendant, and of this man Horn, and of this girl, and of his accomplice, Burkhardt. Horn testified that he saw a man come into the Grand Central Hotel and speak to O'Hare, and that finally he went out with him to the corner; looked at the man and the harness; he had a very small horse. Both Burkhardt and O'Hare testify about O'Hare borrowing the money,—that he had $5, Burkhardt only had $3, and that they borrowed these $2 of the girl to make up the $10 that he wanted. Now, gentlemen, if a $38 harness was offered in the night for sale for $10, a prudent man ought to be on his guard about buying it. He ought to be able to show, if he bought it,

that the transaction was honest and free from suspicion. You have heard the testimony of both Burkhardt and the defendant here, and you must be aware of the terrible strain and temptation they are under to controvert this evidence by false testimony, if false testimony will do them any good. As to the relations between the girl and this Burkhardt, she testifies that he was her lover, and they were engaged to be married. A wife has often as much interest for her husband as the husband himself can have. But now I reach a branch of the case which I think I ought to fully submit to you. Last Monday, I think it was, Mr. O'Hare applied to the court to assign him counsel and means to procure his witnesses with. An order was made assigning Mr. Simonson to aid him. A similar order was made that the sheriff summon, at the expense of Bay county, all the witnesses that he might need in his defense. The sheriff is an officer of the court, over which the court has absolute control about the service of papers, and the court can punish him for contempt for any violation or lack of duty. Simply giving the name of a witness to the sheriff was all that was needed in order to secure his attendance here if he could be found. This court does not recognize any constable at all, except as the sheriff may employ him to preserve order in the court-room. I cannot take his return as any evidence, as I do that of the sheriff or deputy sheriff. He has no business to perform any service of this court except the solitary duty of attending court when requested by the sheriff. Mr. Averill, a constable, an officer not recognized by the circuit court of this county, is sent out by Mr. Simonson to find this man. He starts out at 3 o'clock, and is back that night. He takes a city directory and looks over four or five names, and he goes out to look for Martin. If the story was true that such a man existed, did he or his attorney avail themselves of what the law had placed in their hands in order to get him here? If it is not so, it casts a very black shadow over this defense. You may look at it as part of a scheme to fabricate a defense, to justify it by perjury, and force it through by an immense number of witnesses swearing falsely."

The witness Hattie Smith corroborated Burkhardt. She was interrogated upon cross-examination as to her relations with Burkhardt, and denied any impropriety in them. Afterwards an officer was permitted to testify that

she was a street-walker, and had such a reputation among the police officers, and that she associated and roomed with another woman, not a witness, of bad repute. Wines was not a witness, yet a witness was permitted to testify that on one occasion he knew of his being arrested.

The course taken by the circuit judge cannot be approved. His strictures upon counsel were excessive, and it was not for him to make a partisan argument upon the failure of the defendant to produce Martin. Again, it was error to admit proof of Hattie Smith's reputation, and of Wines' arrest.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.