## PEOPLE *v.* LEONZO.

1. TRIAL—CONDUCT OF COURT—CRIMINAL LAW.
   Where the accused, a colored man, was convicted of robbery while armed with dangerous weapons, his attorney being colored, and it appeared that the court, during the opening, treated the attorney in a way which tended to discredit him in the eyes of the jury and prejudice the rights of the respondent, frequently interrupting counsel in his opening statement and examination of the witnesses, and making remarks which had a tendency to belittle the attorney, the court is required to grant a new trial on the ground of prejudicial error.

2. SAME—CHARGE—WITNESSES.
   Also the reference in the charge of the court to testimony given by the police as entitled to credence and a statement that the respondent who claimed he went to the officer for protection, was, at the time, fleeing, *held*, to amount to reversible error.

Error to the recorder's court for the city of Detroit; Phelan, J. Submitted April 23, 1914. (Docket No. 168.) Decided June 1, 1914.

Kiyde Leonzo was convicted of robbery, being armed, etc. Reversed.

*Grant Fellows*, Attorney General, *Hugh Shepherd*, Prosecuting Attorney, and *Harry B. Keidan*, Assistant Prosecuting Attorney, for the people.

*Chawke & Sloan*, for respondent.

MOORE, J. On the morning of Sunday, December 8, 1912, about 3 o'clock, respondent was arrested by two police officers in the city of Detroit. He was running. His claim is that he and two companions had been out; that defendant left them and was returning home, which is in the immediate vicinity of the place

where he was arrested; that just before then some one threw a rock or brick which hit the side of the building which he was passing; that he stopped and more were thrown; that he then started to run, turned the corner, saw the police officers, and ran to them for protection. The officers stated at the trial that they had been standing in the alley and surprised the defendant as he was running; that one held him, while the other went around the corner to investigate; that they found the complaining witness, one James Leary, holding a handkerchief to a cut in his chin. Leary stated that he had been knocked down and robbed. The officer and Leary then went back to where defendant and the other officer were waiting. Defendant was searched and two pocketbooks and an old razor were found on his person. One of the officers testified that there was blood on the razor at that time, and that it was fresh. His fellow officer testified that the razor was not opened at that time, so far as he knew, and that he was there and saw everything. Defendant claimed that he always carried two pocketbooks, one for large bills and a memorandum, and one for change; that he had been working at the bowling alleys of Alderman Rutter setting up pins, and at the barber shops of a Mr. Murphy and Mr. Trokey as porter, earning $15 to $20 a week; that the razor had been given him by a barber at Mr. Trokey's barber shop about eight months previous to his arrest; that it was no sharper than an ordinary butter knife, and that he had carried it with him "like an old pocket-knife."

Mr. Leary testified. There was no positive identification of the pocketbook. He testified it looked exactly like his, but that it had no distinguishing mark on it; neither could he identify the money. The complaining witness and the defendant had been drinking to some extent, according to the testimony of each, but the officers stated that neither one was under the influence

of liquor. Respondent was informed against. He was charged with robbery, being armed with a dangerous weapon with intent, if resisted, to kill, and found guilty, whereupon he was sentenced to a term of from 10 to 20 years in Marquette prison, with a recommendation that he serve the maximum term. The case is before this court by writ of error.

The respondent is a colored man. He was defended by Mr. Willis, who is also a colored man. Many errors are assigned, but we shall discuss but two groups of them.

Complaint is made of the language and conduct of the court toward counsel for the respondent in that the language complained of tended to belittle counsel and to prejudice respondent in the estimation of the jury.

At the beginning of the trial the following occurred:

"*Mr. Keidan:* If your honor please, the name of the complaining witness in this case is James Leary. On the information it gives it as James Teary. I think that it was a mistake in making a 'T' out of the 'L.' I ask your honor's permission to amend the information in that respect.

"*The Court:* Any objections?

"*Mr. Willis:* No, your honor.

"*The Court:* Very well.

"*Mr. Willis:* May it please the court and the gentlemen of the jury.

"*The Court:* Just take the witness stand [to the complaining witness].

"*Mr. Willis:* I want to open my case now.

"*The Court:* I don't care what you want. Take the witness stand. Now you ask the court's permission when a case is started. Be seated witness.

"*Mr. Willis:* I desire now to open my defense.

"*The Court:* Say so. Make the motion. We don't know what you are going to do. The prosecuting attorney called the witness to the witness stand, and you order him back. You have got no right to do that. Go ahead and tell the jury what you want to.

"*Mr. Willis:* Gentlemen of the jury, this is a case,

while serious on its face, we are going to show that this matter occurred on Saturday night or Sunday morning. Going to show it was done in the district between Antoine and Hastings streets, in a circle of Catherine and Hastings and Mullett. There is a large number of young people and other people going there every Saturday night and Sunday morning, and passing through this district in crowds. It is known as the 'red light district.'

"*The Court:* Well now, Mr. Willis.

"*Mr. Willis:* I just want to open.

"*The Court:* You are not opening, Mr. Willis. If you have got anything that you are going to state that you expect to prove for the defense you want to do so.

"*Mr. Willis:* That is just why I want to do that, your honor.

"*The Court:* You will follow the instructions of the court, or you won't make any at all.

"*Mr. Willis:* All right. All right.

"*The Court:* You are not going to make any stump address to the jury. You will go right ahead and tell them though."

Mr. Willis was cross-examining the complaining witness when the following occurred:

"*Q.* Didn't you hear him?

"*The Court:* The witness has told you repeatedly that he was confused when he was at the police headquarters. He does not recall what was said. There are witnesses on the information who perhaps can give you that information.

"*Mr. Willis:* I want to get all I can from this witness.

"*The Court:* This witness here told you that he cannot remember. I will hold that this is far enough, if you want the man to tell the truth.

"Witness resumes: I .think I spent more than $2 that night. I could not say I spent $10 because I was not where I could spend $10.

"*Mr. Willis:* How much is in there [indicating pocketbook]?

"*Mr. Keidan:* $20.

"Witness resumes: I did not lend any money that night, as I remember.

"*Q.* Now what did this man claim, if you can re-

member, at the time that you all talked at the station about this matter as to money. Didn't he tell you the amount of money that he had?

"*The Court:* I have already ruled that this witness has told you, has told this jury, but in order that you might understand it I will ask the jury: Have you heard this witness repeatedly state to this counsel that he could not tell what took place down there at the police headquarters owing to the confused manner in which he was?

"*Jurors:* Yes.

"*The Court:* That ought to be sufficient."

The officers who made the arrest had testified, and Mr. Willis was examining his client, when the following occurred:

"*Q.* You do know about how much money you had at 6 o'clock?

"*A.* At 6 o'clock?

"*Q.* How much did you state?

"*The Court:* He told us that.

"*A.* I had thirty some dollars. There was $20 taken off me when I was searched. That was my money.

"*Q.* Now as to the blood the officer—one officer said he saw blood on the razor, examined it on the street, and saw it there. The other officer says there was no examination of the razor on the street and saw no blood.

"*Mr. Keidan:* Just a moment.

"*Q.* Now, was it examined on the street?

"*The Court:* Mr. Willis, are you certain of the statement you are making in the presence of this jury, of the testimony?

"*Mr. Willis:* I want him to explain what was done with the razor.

"*The Court:* I am asking you a question. You must answer that question before I will allow you to proceed any further with this trial. You have made a statement in the presence of this jury. Is that statement borne out by any evidence here given by any of the police officers?

"*Mr. Willis:* Yes, Mr. Hayes testified there was blood on the razor and he examined it on the street.

"*Mr. Keidan:* No, sir; he did not.

"*Mr. Willis:* The other officer testified he did not see it examined. He did not see any blood on the street.

"*The Court:* That is not the statement. Read the statement he just made to this jury. [Testimony read by the reporter].

"*The Court:* Did not the other officer testify that he saw him take the razor out but that he did not see—

"*Mr. Willis:* He said that he did not see it examined at all; did not see any blood on the street.

"*The Court:* He did not take it in his hands; he was holding the defendant while the other officer was searching him. I understood it that way. The other officer did not reach over into Hayes' hand and take the razor off this man's person.

"*Mr. Willis:* The other officer, the one that had him in custody.

"*The Court:* Never mind now, when you make a statement hereafter, you make the correct one. * * * *"

Again:

"*Mr. Willis:* I want to ask one question. I presume the court would object. I want to know whether he is positive of the identity of that particular pocketbook. That is all I want to know; the whole thing turns upon that pocketbook.

"*The Court:* The jury is going to determine that question. I will ask the jury have they heard this witness asked those questions before and have you heard them answered?

"*The Jurors:* Yes, your honor.

"*Mr. Willis:* I understand. I would rather the evidence come from the witness on the stand.

"*The Court:* Those questions are asked for the benefit of the jury, not the counsel. Anything further?

"*Q.* Is your mind clearer now than it was that night when you identified that pocketbook, too?

"*Mr. Keidan:* That is objected to, your honor.

"*The Court:* Answer the question. Is your mind clearer now?

"*A.* My mind is clearer now.

"*The Court:* Why don't you answer the question?

"*A.* I thought he objected to the question.

"*Q.* On that night you did say the pocketbook was yours. What do you say now, after your mind is clearer?

"*The Court:* Has not the jury informed you that they heard this man's answer?

"*Mr. Willis:* He has identified the pocketbook that it looks like his; that is as far as it goes; but I want him to come out positively whether or not it is.

"*The Court:* The jury have all sat there and heard this.

"*Mr. Willis:* I think the court might be a little lenient in that matter because it is important to see now whether—

"*The Court:* I think that the court has been very lenient with you all through this case.

"*Mr. Willis:* Certainly he has."

There were other colloquies between the court and counsel of a like nature. It is impossible to read this record without reaching the conclusion that the court failed to treat counsel and his client with that impartiality which is necessary if a fair trial is to be had.

In *Wheeler* v. *Wallace*, 53 Mich. 355 (19 N. W. 33), in reversing the case, Justice COOLEY, speaking for the court, said:

"It is very unusual to have exception taken on writ of error to the manner and deportment of the trial judge in the conduct of the trial, and under ordinary circumstances a court of review would not scrutinize very closely his methods when no error in his rulings was alleged. Still, it is possible for a judge to deprive a party of a fair trial, even without intending to do so, by the manner in which he conducts the case, and by a plain exhibition to the jury of his own opinions in respect to the parties, or to their case; and when it is apparent that a fair trial has not been had, a court of review should give relief as soon for that cause as for any other. The fact that the duty to do so is unusual or unpleasant, is no reason for declining it.

"In this case we are satisfied the plaintiff has not had a fair trial. In saying this it is not necessary to impute to the judge any purpose to be a partisan in

the case, or otherwise unfair. It is not likely he intended to try the case with less than his customary urbanity and courtesy; and when he brings before the jury, as he does in his charge, the familiar figure of the goddess of justice, with her scales nicely weighing and scrutinizing the evidence, it is to be assumed that he means to be as impartial himself as he directed the jury to be. It is nevertheless possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something, the effect of which he would not at the time realize, and thereby accomplish a mischief which was not designed. Possibly such circumstances may have existed in this case."

In *McDuff* v. *Journal Co.*, 84 Mich. 1 (47 N. W. 671, 22 Am. St. Rep. 673), Justice GRANT, speaking for the court, said:

"Whatever language may be used by counsel in the heat of trial, it is the legal duty of the judge to preside and decide with impartiality, and to keep counsel within proper bounds. Appellate courts must presume that one occupying so important a position as that of circuit judge can influence a jury. It is their duty to follow his instructions as to the law. Whenever he expresses an opinion on any disputed fact, or of the character of a witness, or compliments one attorney at the expense of the other, or uses language which tends to bring an attorney into contempt before the jury, or uses any language which tends to prejudice them, he commits an error of law for which the verdict and judgment must be promptly set aside. Appellate courts cannot correct mistakes of fact. Trial courts, therefore, cannot be too circumspect and careful to see that questions of fact are submitted to the unbiased judgment of the jury, which, under our jurisprudence, are for their sole determination. To sanction such conduct and language as the above by the circuit judge would tend to render trials a farce, and result in a denial of justice. Language less open to criticism has been held error by this court. *Wheeler* v. *Wallace*, 53 Mich. 355 [19 N. W. 33]; *Cronkhite* v. *Dickerson*, 51 Mich. 177 [16 N. W. 371]; *People* v. *Hare*, 57 Mich. 505 [24 N. W. 843]."

See, also, *People* v. *Hull*, 86 Mich. 449 (49 N. W. 288) ; *Williams* v. *West Bay City*, 119 Mich. 395 (78 N. W. 328) ; *People* v. *O'Hare*, 124 Mich. 515 (83 N. W. 279) ; *Schwanz* v. *Wujek*, 163 Mich. 492 (128 N. W. 731).

Several assignments of error relate to the charge of the court. We quote but à single portion of the charge:

"I charge you, gentlemen of the jury, that you have no right to disbelieve those police officers merely because they happen to be police officers; and, while the counsel for the defendant in this case has borne rather heavily upon the officers, I am of the opinion that the officers in this case are entitled to a great deal of credit. They saw their duty and they discharged it on the night in question. They took this man into their custody when they found him fleeing. They searched him, and then turned him over to their superior officers. A complaint was made against him for robbery, being armed, and it is for you now to say, after hearing the evidence, whether the State has proved its case against this defendant. If, in your judgment as jurors, you believe the State has failed to prove this man guilty of this crime, it becomes your duty to discharge him."

The judge must have overlooked the claim of respondent that he went to the officers because rocks or bricks were being thrown at him, when the judge said, "They took this man into custody when they found him fleeing." Whether he was fleeing or not was a question for the jury, and not the judge. Some of the language we quoted from the opinion in *McDuff* v. *Journal Co.*, *supra*, is applicable here. See, also, *People* v. *Hare*, 57 Mich. 505 (24 N. W. 843) ; *People* v. *Murray*, 72 Mich. 10 (40 N. W. 29) ; *People* v. *Clarke*, 105 Mich. 169 (62 N. W. 1117) ; *People* v. *Corey*, 157 N. Y. 332 (51 N. E. 1024).

This court in the recent case of *People* v. *Fritch*, 170 Mich. 258 (136 N. W. 493), had occasion to speak of

the practice of commending some of the witnesses, and it is not necessary to repeat what was said there.

For the errors pointed out, this court is required to reverse the judgment of the trial court, set aside the conviction of respondent, and award a new trial. Respondent will be surrendered to the custody of the sheriff of Wayne county.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.