THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN CECIL MCKINNEY, Plaintiff in Error.

*Opinion filed April 22, 1915.*

1. CRIMINAL LAW—*what does not show guilt beyond a reasonable doubt.* Evidence that the defendant knew that the complaining witness possessed valuable diamonds, that he was acquainted with the two men who stole the diamonds, and that he thought he could locate one of them and offered to do so for a reward, does not show, beyond a reasonable doubt, that he instigated the robbery for a share of the proceeds.

2. SAME—*testimony of an accomplice must be acted upon with great caution.* The testimony of an accomplice should be acted upon with great caution, and only when the jury are satisfied from it, together with all the circumstances in evidence in the case, that it is true.

3. SAME—*jury may consider purpose of accomplice in testifying.* The jury should subject the testimony of an accomplice to careful examination in the light of the other evidence in the case and consider the influence under which the testimony is given, and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself or to gratify his malice.

4. SAME—*accomplice may be asked questions as to his reasons for testifying.* It is proper for the defendant's counsel to ask questions of an accomplice with respect to his reasons for testifying in the case, and it is error to deny defendant the right to question the witness as to his expectation of receiving a light sentence or immunity of some kind.

5. SAME—*when admission of evidence is serious error.*  On a trial for robbing a man of diamonds in his place of business, it is serious error to admit testimony that the defendant, on a certain occasion having no connection whatever with the robbery, called at a certain house at two o'clock in the morning and choked the woman who opened the door upon his representation that he had a message for her brother.

6. SAME—*what evidence is not admissible for any purpose.* Where one defendant in a robbery case is asked if he did not tell his mother-in-law that the other defendant had told him he had paid a certain person $500 to fix the case and he replies that he did not make such statement, it is error to allow the mother-in-law to testify that he did make the statement, as such evidence is not admissible for any purpose.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ADELOR J. PETIT, Judge, presiding.

SAMUEL E. FOOS, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, (FRANCIS E. HINCK-LEY, of counsel,) for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Montis Butler, Lind LaFount and the plaintiff in error, John Cecil McKinney, were charged in the criminal court of Cook county with robbing Christopher C. Wilkins of money of the value of $14, a diamond ring of the value of $1200 and a diamond stud of the value of $600. The defendants were put on trial, and after evidence had been heard and the case for the prosecution closed the defendant LaFount withdrew his plea of not guilty, entered a plea of guilty and tendered himself as a witness for the State. The case was then re-opened and LaFount testified. The jury found the defendants Butler and McKinney guilty and they were sentenced to the penitentiary at Joliet. The plaintiff in error, McKinney, sued out a writ of error, and the record is in this court as a return to the writ.

The plaintiff in error was not present at the commission of the crime. Christopher C. Wilkins testified that on May 29, 1914, the defendants Butler and LaFount came into his drug store at 127 West North avenue, in Chicago, shortly after two o'clock in the afternoon; that Butler pointed a revolver at him and told him to take off his diamond stud, which he did; that Butler then told him to take off the diamond ring and to give the diamonds to LaFount; that Butler then told LaFount to clean the cash register and he would kill Wilkins if he moved; that Butler then ordered Wilkins back of the prescription stand and Butler and LaFount left the store, and that Wilkins chased the robbers and shot LaFount in the leg and recovered his ring and $13.35 taken from the cash register.

When the State concluded its case, before LaFount entered his plea of guilty and offered himself as a witness, all the evidence in any way relating to McKinney was as follows: Wilkins testified that McKinney and his wife were patrons of the drug store, and three or four days before the robbery they were in the store, when McKinney made a small purchase and said, "Those are pretty nice rings you have there;" that Wilkins said, "Yes, they are pretty fair phonies;" that McKinney called the attention of his wife and said, "He calls them phonies," and she said, "Well, you can't fool me; I know what those are;" that McKinney verified her statement that they were real diamonds; that on the night of June 10, 1914, McKinney came into the drug store and asked Wilkins if he had caught Butler and if there was any reward for him, and said he had heard Wilkins had offered $50 reward for him, and Wilkins said he had not; that McKinney went out and came back and wanted to have a private talk with Wilkins, who said that he would talk where he was; that Wilkins had stationed a policeman behind the prescription stand, and they went back where the policeman could hear; that McKinney proposed that if Wilkins would put up $100

with a party to be mentioned later he would turn Butler over to him, but he did not want his name mentioned, and that Wilkins declined the proposition. The elevator conductor at 1508 LaSalle street, where McKinney lived on the sixth floor, testified that he took LaFount and Butler in the elevator up to the sixth floor on the day of the robbery, and that LaFount went away and returned the same afternoon with a package wrapped in a newspaper. A policeman testified that when McKinney was brought out of jail to the State's attorney's office he found LaFount there, and said, "You dirty little dope fiend, what are you doing here?"

This evidence showed knowledge on the part of McKinney that Wilkins had valuable diamonds, but Wilkins said that McKinney was not the only one who commented on the brilliancy of his diamonds, which is not strange in view of the fact that Wilkins said the diamond stud was near three carats and the other diamond was of the value of $1200. That evidence would apply to a great many law abiding citizens. The evidence tended to show acquaintance of McKinney with Butler and LaFount, and that McKinney thought he could locate Butler and was willing to do so for a reward. It would scarcely be contended that such evidence established the guilt of McKinney beyond a reasonable doubt.

When the case was re-opened LaFount testified that he had known McKinney about a month and a half before the robbery; that he and Butler went to 1508 LaSalle street, to the top floor, where McKinney lived; that McKinney asked Butler if he had the guns, and Butler said they were under the pool-room steps at Joe Fogarty's; that McKinney sent the witness after the revolvers, and he brought them back and gave one to Butler and put the other in his own pocket; that McKinney asked him if he had nerve enough to do the job to hold up Wilkins; that McKinney said if they got the diamonds he would cut them out of

the settings and they could do what they wanted to with the settings, and told Butler he had better throw them in the lake; and that Butler and the witness were to get two-thirds and McKinney one-third of the money for the diamonds. The witness said he did not wrap the revolvers in a package and did not have any package when he went to McKinney's, contradicting the elevator man about having a package, which could only apply to the revolvers, as there would be no newspaper package of diamonds and money.

On the cross-examination of LaFount he was first asked concerning various statements he had made, which he admitted to be false. It also appeared that he had told two policemen that McKinney was connected with the case and they had talked about his testifying for the People, after which the following occurred:

Q. "Now, then, have you an arrangement now, either personally or by your attorneys, that you would testify here on behalf of the People?—that you are to receive a lighter sentence or immunity of some kind?

The court: "Now, I will answer that for you, Mr. Foos, and tell you if you don't know, that under the law there is not anybody in the world that can control the sentence now except the court, in view of the fact that he has made a plea, and that this court has not had one single, solitary word of conversation with any living soul about this boy's sentence.

Mr. Foos: "No! no! your Honor. Not the court I don't mean.

The court: "I thought you might just as well end this talk about promises of immunity, because nobody else can give him anything and no living soul has told me about it.

Mr. Foos: "No, your Honor; but to induce this statement—not what the court can do.

The court: "I make this statement for the record. You know very well that nobody can make a promise of that kind except this court. You know that.

Mr. Foos: "No, your Honor. I mean the inducement for him to testify. Your Honor got me wrong on that,—you misunderstood me.

The court: "I understand you perfectly. I will be very glad to have you resume this cross-examination, but limit it to the questions of what took place in or about his crime and to questions tending to affect this boy's credibility. That is all you are entitled to.

Mr. Foos: "I am not inferring anything as to the court, you know. I have an idea what the court will do under his plea, as far as that is concerned, but the question I am leading up to is what induced him to testify.

The court: "You have been leading up to it quite awhile. Now lead down awhile and get to business awhile."

The plaintiff in error testified and denied all connection with or knowledge of the robbery, or that he aided, abetted, advised or assisted in the same in any way. He said that he was a musician, employed in a theater at night and working in a cigar store in the daytime, and that his wife was also employed. He admitted, on cross-examination, that he knew a man named Boitano, and he was asked if he gave Boitano $500 to fix the case, and he answered that he did not. He was also asked if he did not tell a policeman who was present at court and stood up for identification, that he gave Boitano $500 in the case. He said that he did not, and although the officer was present in court he was not called on to prove the alleged statement nor was there any other evidence of the fact. The witness was then compelled, over objections, to answer questions whether he went to the home of Boitano at two o'clock in the morning and saw his sister (Miss Boitano) there and told her that he was a messenger boy, and when she called a police officer choked her. He admitted that he went to the house but denied that he told Miss Boitano that he was a messenger boy or that he choked her. Eva Boitano was called as a witness and was permitted to testify that McKinney

came to their house a little after two o'clock in the morning of August 10 and said that he was a messenger boy and had a message for her brother, who had been a policeman, and that he would like to talk to her and wanted her to come out. She was then asked this question: "At that time and place did the defendant, McKinney, choke you?— grab you by the neck?" and she made this answer: "He grabbed my mouth." On cross-examination Butler was asked if he did not have a talk with Mrs. LaFount, in which he told her that McKinney told him that he had given a chum of his, Boitano, $500 to fix the case. The court overruled an objection, and the witness denied that he told Mrs. LaFount anything of the kind. Marie La-Fount, the mother-in-law of Butler and mother of Lind LaFount, was called as a witness for the prosecution, and testified, over objection, that Butler made the statement to her concerning which he was interrogated.

The testimony of an accomplice is admissible against a defendant in a criminal case, and a conviction upon such testimony may be sustained if it is of such a character as to prove, beyond a reasonable doubt, the guilt of the defendant. It is, however, universally held that the testimony of an accomplice is liable to grave suspicion and should be acted upon with great caution, and only when the jury are satisfied from it, together with all the circumstances in evidence in the case, that it is true. The jury should subject such testimony to careful examination in the light of all other evidence in the case and consider the influence under which the testimony is given, and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself or to gratify his malice. (*Hoyt* v. *People,* 140 Ill. 588; *Campbell* v. *People,* 159 id. 9; *People* v. *Feinberg,* 237 id. 348.) The credibility of LaFount was a question for the jury, and his testimony was to be carefully weighed in view of his character, his connection with the crime and any motive that

may have influenced him to offer himself as a witness in behalf of the prosecution to aid in the conviction of another defendant. Unless he obtained some benefit his plea of guilty would result in the same judgment as if he had been found guilty by the jury, and the plaintiff in error had a right to prove anything having a legitimate tendency to throw light upon his truthfulness, so that the jury would be advised of everything which would enable them to judge of the credit to be accorded to his testimony. The examination was proper for the purpose of showing what influence operated on the mind of the witness causing him to withdraw his plea of not guilty and enter a plea of guilty. Counsel for the plaintiff in error has attached to the transcript of the record a certified copy of subsequent orders in the case of LaFount, but they are not a part of the record, and whether any plan or arrangement with anyone concerned in the prosecution was afterward carried out is immaterial on the question of LaFount's motives in testifying. The court erred in not permitting the examination.

The cross-examination of the plaintiff in error about going to Boitano's house or what occurred there, and the testimony of Eva Boitano that he asked her to come out and "grabbed my mouth," were entirely incompetent and it was serious error to admit the testimony. There was no evidence to connect it with the case in any way, and the only effect would be to create a prejudice against him. The examination of Butler as to whether he told Mrs. LaFount that McKinney told him that he had given Boitano $500 to fix the case, and the testimony of Marie LaFount that she had such a conversation with her son-in-law, Butler, were incompetent for any purpose. The answer of counsel for the People is, that by the fifth instruction the court told the jury that the statements of Butler in the absence of plaintiff in error could not be considered as evidence against the plaintiff in error, but that instruction did not help the matter, because the statements were not evidence

against anybody. The evidence that Butler said that Mc-Kinney said something was purely hearsay, and while statements made by Butler tending to show his guilt would be admissible against him, this evidence did not tend to prove that Butler had paid anything or done anything or that anything was paid for him, so that it was not admissible for any purpose. In the argument for the People it is said that there is some evidence not shown by the abstract. If that is so it was the privilege of counsel to present it in an additional abstract, which was not done.

The plaintiff in error did not have the fair trial which the law secures to everyone charged with crime, and therefore the judgment is reversed and the cause remanded.

*Reversed and remanded.*