Argued June 6, reversed and remanded August 20,
costs retaxed September 19, 1956

## STATE OF OREGON *v.* BAILEY

300 P. 2d 975
301 P. 2d 545

*Bruce R. Avrit* and *F. Gordon Cottrell,* Deputy District Attorneys for Lane County, Eugene, argued the cause for respondent. With them on the brief was Eugene C. Venn, District Attorney for Lane County, Eugene.

*Lamar Tooze* and *Roland K. Rodman* argued the cause for appellant. On the briefs were Tooze, Kerr, Hill, Dougherty & Tooze, Portland, and Rodman & Rodman, Eugene.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Richard G. Bailey, from a judgment of the circuit court which adjudged him guilty of the crime of conspiring with his brother, Alfred P. Bailey, "to commit the crime of

obtaining money under false pretenses'' from the First National Bank of Eugene.

ORS 161.320 provides:

"If two or more persons conspire to commit any felony defined and made punishable by the laws of this state and one or more of the parties does any act to effect the object of the conspiracy, each of the parties to the conspiracy, upon conviction, shall be punished * * *.''

The indictment charged that September 1, 1953, when the defendant was an officer of a concern entitled Bailey Lumber Company, he and his brother, Alfred P. Bailey, conspired to obtain money falsely for the Bailey Lumber Company in the following manner:

"* * * by pretending to the said bank that lumber had been shipped from the Willow Creek Lumber Company of Willow Creek, California, to certain purchasers, and by presenting to the said bank certain false tokens, to-wit: certain false documents purporting to be valid memorandums of bills of lading for lumber shipped and certain false documents purporting to be valid invoices for lumber shipped, to effect a loan to the said Bailey Lumber Company from the said bank upon the purported memorandums and invoices, and to effect the object of the said conspiracy, the said conspirators did the following acts, to-wit:

"1. The said conspirators did cause to be presented to the Main Branch of the First National Bank of Eugene, Oregon, on the 16th day of December, 1953, certain false documents, to-wit: a false document purporting to be a valid memorandum of a bill of lading, shipper's no. 3086D, issued by the Willow Creek Lumber Company of Willow Creek, California, of a purported lumber shipment consigned to Hill & Morton, Incorporated, of Cutten, California, on December 12, 1953, and a false document purporting to be a valid invoice of Bailey

Lumber Company, Incorporated, No. 12-12-3086D, dated December 16, 1953, covering the said purported shipment of lumber to Hill & Morton, Incorporated, as aforesaid."

The part of the indictment just quoted which is preceded with the numeral 1 is succeeded by 13 other paragraphs each of which alleges a transaction similar to the one which the quoted paragraph describes.

Thus, the indictment charges that the defendant and his brother Alfred conspired to deceive the First National Bank of Eugene into making loans of money to the Bailey Lumber Company by presenting to the bank as security for each loan which they sought two false documents: (1) a false invoice which purported to represent lumber produced by the Willow Creek Lumber Company and sold by the Bailey Lumber Company to one of its customers, and (2) a false bill of lading which appeared to represent the same nonexistent lumber.

The appellant's brief submits 13 assignments of error. We will presently set forth our analysis of two of them, the second and the third. The two are controlled by the same principle of law. The Second assignment of error challenges a ruling which occurred during the recross-examination of one Paul W. Cunningham, a witness for the state. The third attacks a ruling which was made during the cross-examination of one Harold W. Eldridge, another witness for the state. The instructions to the jury dealt with Cunningham and Eldridge as accomplices, and we believe that the state concedes that the two men were accomplices of the defendant, in the event that the latter committed the crime mentioned in the indictment. Before quoting the two assignments of error we explain that Messrs. Rodman and Tooze, who are mentioned in them, are

counsel for the defendant. Mr. Venn, who is also mentioned in the quoted passages, is the district attorney for Lane County and Mr. Cottrell is his deputy.

The following is the second assignment of error:

"The Court on re-cross examination of witness Paul W. Cunningham erred in sustaining plaintiff's objection to the following question:

'By Mr. Rodman:

'Q Mr. Cunningham, has any criminal charge been filed against you at any time?

'Mr. Cottrell: Your Honor, I object to that as being irrelevant.

'The Court: Objection sustained. It has no bearing on this case.

'Mr. Rodman: It is to show bias or motive.

'The Court: Objection is sustained.

'Mr. Rodman: Yes, Your Honor.

'Mr. Venn: No further questions.

'Mr. Rodman: May it please the Court, can we make an offer of proof in connection with that last?

'The Court: No, you have the ruling of the Court. We won't have any speeches to the jury. That is the record, when the Court rules on your question.' "

The third assignment of error follows:

"The Court on cross examination of witness Harold W. Eldridge erred in sustaining plaintiff's objection to the following question:

'By Mr. Tooze:

'Q Have you ever been prosecuted in connection with the Bailey Lumber Company affairs?

'Mr. Cottrell: Objection, Your Honor.

'The Court: Objection is sustained.' "

We will now take note of evidence which shows the manner in which the fraudulent practice started and

of other evidence which indicates whether or not the defendant had knowledge of it. The Bailey Lumber Company, located in Eugene, was a wholesale lumber dealer. The defendant was its president and owned 49 per cent of its capital stock. His brother Alfred was an employe of the company as were also Eldridge and Cunningham. None of them had a financial interest in the company.

At Willow Creek, which is in Northern California, someone had built a small sawmill prior to 1952 to which the Bailey Lumber Company made a loan. In the early part of 1952 when payment of the loan defaulted, the defendant and two others organized the Willow Creek Lumber Company which is mentioned in the indictment. The defendant became the owner of 48 per cent of its capital stock and the two others purchased the rest. The corporation acquired ownership of the mill. The defendant described Willow Creek mill as "an inefficient mill." Presently he undertook for the plant an extensive program of modernization and expansion with the view of increasing its output. The program proved costly. The state's brief declares: "By the fall of 1953 the defendant had personally invested between $250,000 to $350,000" in the Willow Creek mill. The defendant at that time was 34 years of age and had secured his means through his own enterprise. By August of 1953 the construction program had strained the defendant's financial resources severely. The next month or so the Bailey Lumber Company was forced to ask some of its creditors to be patient.

The undertaking to increase the mill's output met with unexpected obstacles. The contracting concern which had been given charge of the undertaking proved

incapable and had to be removed. In August and again in September, 1953, forest fires broke out in the mill's vicinity and upon both occasions the Forestry Service impressed the crew of the mill into fire fighting, with the result that manufacturing operations were forced to suspend. At other times production ceased due to the reconstruction work which was underway or because of breakdowns in machinery. The repetition of shutdowns materially diminished the output of the mill and its income. Several declines in the market price of the mill's product heightened the difficulties. The mill's products were studdings and crossarms. Studding declined from $65 to below $50. The succession of shutdowns and the severe decrease in market price curtailed the income of the Bailey Lumber Company so badly that it had but little money with which it could buy lumber for resale. Thereby it was forced to confine its activities largely to the product of the Willow Creek mill, which, as we have seen, was studdings and crossarms.

Prior to August of 1953 the defendant had spent virtually all of his time in the office of the Bailey Lumber Company. A mill superintendent and other administrative employes had charge of operations at Willow Creek. By August of 1953 the unfavorable conditions resulting from repeated shutdowns, curtailed production and low market price caused the defendant to devote most of his time to Willow Creek. He was resolved to increase output and curtail expenses. When he began to give the major part of his time to the Willow Creek mill, his brother Alfred assumed charge of the office of the Bailey Lumber Company. The defendant worked long hours at Willow Creek in his efforts to complete the modernization which the contractor had left unfinished, to increase the volume of

output and reduce production costs. The state's brief gives this description of his labors:

"Though still, at least nominally, President of both corporations, he labored with the millwright's crew, assisted in making repairs, worked at several stations in the mill, repaired roads and assisted in the installation of electrical equipment."

He lived in a trailer immediately back of the mill, and estimated that he was on duty sixteen hours per day. It will be observed that he devoted his efforts to the mill rather than to the office.

The defendant was in the Bailey Lumber Company's office for no more than one third of September. Ten days or less represented the time which he spent there in October. In November he was in Eugene for a maximum of five days and was there for an even briefer period in December.

In 1950, when the Bailey Lumber Company began operations, it adopted a practice of borrowing money from the First National Bank of Eugene of which it is necessary to take note. When it sold a truckload of lumber (truck and trailer) it prepared a paper known as an invoice. The latter listed the lumber and the price charged the customer. Then the company assigned the invoice to the bank as security for a loan which amounted to 80 per cent of the invoice price. The loan was repayable in 60 days. The bank set $250,000 as the maximum for outstanding indebtedness at any one time. The bank mailed the assigned invoice to the customer and thereby effected collection. The amount of the loans averaged $700. By the fall of 1953 the total borrowings aggregated over six million dollars.

When the defendant began to spend most of his

time at Willow Creek, the loan transactions were handled by Alfred Bailey and the other two individuals whom we have mentioned, Eldridge and Cunningham. The defendant, however, in anticipation of borrowings, signed from time to time pads of blank notes which he entrusted to the three men. Cunningham, as a witness for the state, described himself as invoice clerk. He prepared most of the invoices, typed the notes and prepared the necessary deposit slips. Generally, he was the individual who took the papers to the bank and obtained the loans. Eldridge, who characterized himself as the sales manager, often helped Cunningham with the work we just described.

We have mentioned the period of idleness which the August forest fire imposed upon the Willow Creek mill and the resulting ill effect upon the income of the Bailey Lumber Company. Due to the shutdown, the mill had produced no lumber for a number of days and, since the Forestry Service had preempted even the company's truck drivers, no lumber had moved out of Willow Creek. Presently, according to Alfred, the payroll had to be met but the Bailey Lumber Company's bank account was inadequate to the need. Thereupon Alfred, so he swore, consulted the defendant, who recommended that he telephone to the firm of Middleton & Bierne, customers of the Bailey Lumber Company, and request of them the privilege of invoicing the firm for ten or twelve truckloads in advance of shipment. The privilege was granted and in consequence the Bailey Lumber Company prepared the invoices, assigned them to the bank and obtained the desired loans. The bank was unaware that the invoices did not represent shipments which went forth concurrently with the preparation of the invoices. Later, when the truck drivers were available, the lumber left Willow Creek and the de-

mands of the invoices were met. In September, as we have seen, another forest fire forced the mill to close. Upon that occasion Alfred again faced a payroll without the needed money. He once more requested of Middleton & Bierne the privilege of employing advance invoices. The privilege was again granted. The defendant denied that he told his brother to request of Middleton & Bierne the privilege of advance invoicing and swore that he was unaware of what had been done.

When the above transactions occurred, the Bailey Lumber Company submitted to the bank no false bills of lading. In fact, at that time the bank did not require that the invoices be accompanied with bills of lading or any copy of the latter.

Alfred testified that sometime in August the bank notified him and the defendant that no loans would thereafter be made upon invoices unless the latter were accompanied by memorandums of the bills of lading showing that the lumber listed in the invoices had actually been placed into the carrier's custody for transportation. According to him, the demand precipitated a crisis for the company. Alfred explained that at that time the Bailey Lumber Company had little cash and that if a loan had to wait until a bill of lading came from Willow Creek to Eugene the Bailey Lumber Company would be embarrassed. The bank's demand was succeeded immediately by a conference in the Bailey Lumber Company office which was attended by him (Alfred), the defendant and Eldridge. We now quote from Alfred's testimony, but before doing so explain that when he speaks of Dick he means the defendant, Richard G. Bailey. He testified:

"At that time, as I say, we were all pretty excited because we didn't have any money in the bank. I can't exactly remember the exact words, but it

was to this effect, that we'd just about have to close down because we didn't have—well, normally speaking, we'd have a way—

\* \* \* \* \*

"That if we'd have to wait for the invoices to arrive from Willow Creek that we wouldn't be able to meet our obligations. So, consequently, we'd have to come up with some idea or something to, No. 1, either speed the invoices or get them up here in a terrible hurry. And I was talking, and Hal Eldridge was talking and Dick was talking, and one of us at that time, and it possibly could have been myself, came up with the idea of putting on the invoices—actually we didn't call it a forged Bill of Lading and then replacing that false Bill of Lading the moment the other one did arrive from Willow Creek.

"Q (By Mr. Avrit) Now, was any statement made by Mr. Richard Bailey as to the length of time that transaction would continue?

"A Yes. Because at that time we were still a little bit in the hole due to that first fire. So, consequently he definitely made the statement, if we could come up with some practice that would just carry us over this period of time; and it would be a very short period of time that we would have to do it, so no one could possibly get hurt.

"Q Of your own knowledge, do you know how soon after that, that that practice started of attaching—

"A Within a day or two, because that was the whole reason why we were so nervous waiting in the office for the return."

In the above manner, according to Alfred, a practice was begun of forging memorandum bills of lading and of attaching the spurious instrument to the invoice. The conjoined document was then delivered to the bank in order to induce it to make the loan. There is no contention that the defendant prepared any of the false

bills of lading or presented any of them to the bank. Likewise, no one argues that the defendant wrote any of the advance invoices or took any of them to the bank. We add that none of the instruments were prepared at Willow Creek.

The indictment speaks of a "memorandum of a bill of lading." In the fraudulent transactions no bill of lading was actually presented to the bank. Bills of lading, when genuine, do not make their way to a bank but are for the carrier. The instrument which the bank requested was a memorandum of the bill of lading. The paper which the bank received was a copy of what purported to be a genuine bill of lading. It even bore what appeared to be a carbon copy of the truck driver's signature. The lumber mentioned in it was non-existent. The memorandum bills of lading, as also the advance invoices, were written by Alfred, Cunningham, Eldridge and an occasional other employe of the Bailey Lumber Company. It will be observed that Alfred swore that "within a day or two" after the bank's demand for the memorandum bills of lading he inaugurated the fraudulent course. In narrating the bank's demand, he testified that when he explained to the bank that immediate inauguration of the new program would subject the Bailey Lumber Company to the embarrassing inconvenience of having to wait for several days before any bill of lading could reach Eugene from Willow Creek, the bank's officials agreed that the lumber company would have "approximately two weeks" before being required to adopt the new practice.

The above describes the start of the practice whereby Alfred, Cunningham, Eldridge and an occasional other employee of the Eugene office forged memorandums of bills of lading which they attached to false invoices and thereby obtained loans of money

from the bank for the Bailey Lumber Company. The practice, as we have seen, was begun, according to Alfred, about the middle of August, 1953. It continued until January, 1954, when the fraud was discovered. At that time there was in the possession of the bank $172,000 of invoices. However, $22,000 of them were genuine; that is, they represented the sale and shipment of real lumber.

The defendant, as we will presently observe, testified that the bank did not make a demand that memorandums of the bills of lading must accompany the invoices until late in September or early October, 1953. As a witness, he did not dispute the testimony given by Alfred, Cunningham and Eldridge in which they described their course of forgery and falsification. He swore, however, that he had no knowledge of it until the bank discovered it and informed him on January 25, 1954.

Alfred conceded that he himself prepared some of the advance invoices and forged memorandums of bills of lading. He swore that Cunningham and Eldridge prepared many of them. Cunningham was the individual who generally took the conjoined documents to the bank and obtained the loans.

Cunningham acknowledged that he prepared many of the false documents. The following is taken from his testimony:

> "A Well, we had bought pads of Bills of Lading from downtown which had four copies on it or the original and three copies, and we would make— write the amount by hand showing the Willow Creek number and the Bailey Lumber Company number, and the amount of footage, and the type of lumber, where the destination was, and who it was shipped

by, and then the driver's name on it—signature as being picked up.

"Q Where was the signature obtained, the truck driver's signature?

"A It was usually copied, or traced, or just written down from an original Bill of Lading that was actually signed by a driver.

"Q Who instructed you to prepare these memorandums of Bills of Lading?

"A Al Bailey."

Eldridge gave the following testimony:

"Q Did you prepare any of these memorandums of Bills of Lading, Mr. Eldridge?

"A I did."

It will be observed that Cunningham even described the manner in which a signature which appeared to be that of a truck driver was affixed to the false bill of lading.

The defendant acknowledged that the bank told him and Alfred that it would no longer make loans upon the invoices alone and demanded that each invoice be accompanied with a memorandum of the bill of lading. He was positive, however, that the conference in which the bank made its demand did not occur in August but toward the end of September or in early October. He explained that he was certain of the day because at that time he was wearing a large brace for his back as the result of an injury which he had sustained. The bank officials who testified recalled that in the course of the meeting, during which they made their demand, the defendant spoke of an injury. The appliance concern that made the brace submitted records at the trial which corroborated the defendant.

Concerning the request that the memorandum bills of lading be attached to the invoices, the defendant testified:

> "Well, at the bank meeting, the bank requested that the Bills of Lading—proof of shipment accompany the invoices and the notes at the time that they were discounted at the bank or presented to the bank, and I didn't see any particular hardship in that, and I turned to my brother and I asked him—said, 'Don't you think that will be all right? Do you see any reason?' He said, 'No, we can comply with that,' but he said, 'we have a payroll or logs or something coming due right away,' and he said, 'it would work a hardship on us if we had to put it into effect right immediately,' so the bank officials said that—oh, ten days or two weeks from that date that the practice would have to start, they would have to accompany it."

We have now described the manner in which the forged bills of lading were prepared and used. When the deception was discovered, Alfred assumed full responsibility and absolved the defendant. A few days later, when the defendant sought financing from a Mr. Walter M. Gleason, who owned a tract of timberland near the property of the Willow Creek Lumber Company, Alfred prepared a written statement which he handed to Mr. Gleason in which he affirmed that he alone was responsible for the fraudulent papers and that no guilt was attributable to the defendant.

In quoting the second assignment of error we took note of the fact that when Cunningham was upon re-cross-examination, defendant's counsel asked him whether "any criminal charge" had been filed against him "at any time." The inquiry was not limited to the fraudulent transactions mentioned in the indictment. The state, as we have seen, objected to the ques-

tion on the ground "irrelevant," and it was sustained with a ruling, "It has no bearing on this case." At that point defendant's counsel declared that his purpose was to reveal "bias or motive," but he did not rephrase his question so that it would serve that purpose. The third assignment of error, as we have seen, is based upon a question which defendant's counsel submitted to Eldridge during cross-examination and which asked "Have you ever been prosecuted in connection with the Bailey Lumber Company affairs?" An objection, which disclosed no grounds, was sustained.

■ It is evident that the defendant's purpose in asking Eldridge whether any criminal charges had been filed against him on account of his wrongdoings in the Bailey Lumber Company transactions was to uncover his bias, motive and interest. But the question propounded to Cunningham was not limited to Bailey Lumber Company matters and inquired in regard to criminal charges in general. It was not restricted to convictions. No error occurred when the objection was sustained to the question which defendant's counsel submitted to Cunningham. ORS 45.600; *State v. Broom,* 121 Or 202, 253 P 1042, 253 P 1044; and Wigmore on Evidence, 3d ed, §§ 980(a) and 982.

Now we will confine ourselves to assignment of error three. Whether or not the defendant is guilty of the charge submitted by the indictment, Eldridge acknowledged that he committed the very crime which he attributed to the defendant. Whenever a witness concedes that he was an accomplice in the commission of a crime, his self-avouched wrongful conduct suggests that he may have an evil purpose or motive for turning against those whom he describes as his erstwhile confederates. A witness who admits that he wrote counterfeit documents, forged signatures and employed the

instruments as the means of deceiving a bank into parting with its money, denounces himself. When the testimony of an accomplice is placed before a jury under a supposition that it may reflect the truth, the administration of justice demands that cross-examination should explore motive, bias and interest.

An accomplice has a powerful motive for currying favor with the prosecuting attorney. After he has revealed his criminal course of conduct to the police and the prosecuting attorney, his liberty is at their sufferance. Fears, whether warranted or not, that they will imprison him, publish his confession or cause his indictment may prompt him to make statements upon his own volition which he hopes will protect him. Sleepless nights and a harrowed conscience tincture in his mind the facts with the false. Few have as great an incentive as he to lay the ultimate blame for the wrong which he committed upon another.

The courts, almost without exception, hold that a defendant is entitled to question an accomplice and a co-defendant in the very manner in which this defendant attempted when he was prevented by the trial judge's challenged ruling.

In *People v. Simard,* 314 Mich 624, 23 NW2d 106, the defendant had been adjudged guilty of the crime of procuring a miscarriage of a girl, 15 years of age. The boy's mother had taken the pregnant girl to the defendant for an abortion and had paid the defendant's fee. She testified for the state. On cross-examination she admitted that she knew that she was violating the law. When she was asked whether she had been arrested, an objection by the prosecutor was sustained. We now quote from the decision:

"* * * This was error. Under the circumstances this information was pertinent to show the

interest of the witness, as she was an accomplice, and her son was guilty of statutory rape. It is true that the prosecutor and police officer or their methods or discretion were not on trial, but the question of her credibility and her interest in the case became pertinent. In People v. Hare, 57 Mich. 505, 24 N. W. 843, 849, we said: 'The court refused to allow defendant to show the fact that no information had been filed against Billington. Billington was a confessed confederate and an accomplice * * *. No conviction could have been had upon this record without his testimony, * * *. It was not only proper, but it was the duty of counsel for the prisoner to place before the jury all the circumstances surrounding the witness upon the stand, as well as any fact which would have any reasonable tendency to affect his credibility; and the fact that he was not informed against for the crime he stood charged with, and that he was treated with the leniency usual in cases of informing accomplices who volunteer to give testimony against their confederates in crime, had its bearing upon his credibility, and we think the circuit judge erred in ruling otherwise.' "

In *People v. Andrae*, 295 Ill 445, 129 NE 178, the court, in speaking of an accomplice's testimony, said: " * * * The jury should subject such testimony to careful examination in the light of all other evidence in the case and consider the influence under which the testimony is given and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself, or to gratify his malice. People v. McKinney, 267 Ill. 454, 108 N. E. 652. The credibility of Wadsworth was a question for the jury, and his testimony was to be carefully weighed in view of his character, his connection with the crime, and any motive that may have influenced him to offer himself as a witness in behalf of the prosecution to aid in the conviction of plaintiffs in error; * * *. The identity

of plaintiffs in error with this crime depends wholly upon the testimony of Wadsworth, and they were entitled to show by the only means at hand—the cross-examination of this witness—what influence operated on his mind to cause him to testify on behalf of the people. The court erred in sustaining these objections.''

*State v. Pellett,* 53 ND 183, 204 NW 983, was based upon a charge of grand larceny. The accomplice testified for the state. To a question as to whether he had been arrested, objections were sustained. In reversing, the court declared:

''* * * It has been the law in this jurisdiction for over thirty years that great latitude should be allowed in the examination of an accomplice.''

In *Sandroff v. United States,* 158 F2d 623, which was based upon a charge of conspiracy to violate price regulations, the cross-examination and rulings thereon took a course substantially the same as in the case before us. The court considered the matter at length and in so doing ruled:

''* * * The two Ginns were the chief and indispensable Government witnesses in the prosecution of Sandroff and his company. In such circumstances, it was highly important that latitude be allowed in cross-examination to test their motives for testifying against Sandroff as bearing directly upon their credibility.''

The judgment of conviction was reversed.

The leading case of *State v. Kent,* 4 ND 577, 62 NW 631, declares:

"On cross-examination of the accomplice, Swedensky, counsel for the accused asked him whether he expected to be hung for his crime. This question being objected to by counsel for the state, the court

sustained the objection. In this the court committed error. One who is on trial for his life should be allowed great latitude in the cross-examination of the witness who, by his own confession, can have no hope of escaping the death punishment save through the indulgence of those who, under the law, have his life in their hands. An accomplice, in such a case, in implicating another with him in guilt, is under the influence of the most powerful motive that can shape human conduct. * * * Even when the accomplice has nothing in the way of word or conduct from any one connected with the prosecution on which to build an assurance, he may have some expectation—leading all the way from a faint glimmer of hope to confident belief—that, if his testimony results in the conviction of another, he himself will reap some reward. One whose life he is swearing away has a right to discover, if he can, by the admission of the accomplice himself, that his testimony is given under a hope of life, which he cannot entertain unless he looks for indulgence. The accused has a right to have such fact laid before the jury on the question of the accomplice's credibility.''

We shall resort to the decisions no further. Many to similar effect are cited in Wigmore on Evidence, 3d ed, § 967, and McCormick on Evidence, p 84.

■ We are satisfied that the defendant was entitled to reveal to the jury the bias, motive and interest of the accomplices. But the state points to the fact that the ruling, which is the subject matter of assignment of error three, occurred upon cross-examination and argues that cross-examination is subject to the discretion of the trial judge. Its contention is well answered in *State v. Roberson,* 215 NC 784, 3 SE2d 277, which says:

"Latitude is allowed in showing the bias, hostility, corruption, interest or misconduct with re-

spect to the case or other facts tending to prove that the testimony of the witness is unworthy of credit. * * *

"Cross examination would be of little value if a witness could not be freely interrogated as to his motives, bias and interest, or as to his conduct as connected with the parties or the cause of action; * * *.

"For the purpose of affecting the credibility of a witness, he may be cross examined as to his interest in the event of the suit or the state of his feelings toward the respective parties, his conduct in connection with the cause of action or collateral facts which tend to show that he is prejudiced or interested. * * *

"The cross examiner is at liberty and is often compelled to attack the credibility of the witness and, for that purpose, must be allowed latitude in asking questions which would otherwise be irrelevant to the issue. For the purpose of testing the credibility of a witness, it is permissible to investigate the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, inclinations and prejudices, * * *.

"It bears against the credibility of a witness that he is an accomplice in the crime charged and testifies for the prosecution; and the pendency of an indictment against the witness indicates indirectly a similar possibility of his currying favor by testifying for the State; so, too, the existence of a promise or just expectation of pardon for his share as accomplice in the crime charged. 2 Wigmore on Evidence, 2nd Ed., 350.

"While latitude is allowed in showing the bias, hostility, corruption, prejudice and interest or misconduct of the witness with respect to the case or other facts tending to prove that his testimony is unworthy of credit, 3 Jones on Evidence, 1538, the question as to the extent to which the cross examination may extend is to be determined with a view

to the discretion of the trial judge. Nevertheless, if the latter has excluded testimony which would clearly show bias, interest, the promise, or the hope of reward on the part of the witness, it is error and may be ground for a new trial. Alford v. U. S., 282 U. S. 687, 51 S. Ct. 218, 75 L. Ed. 624; 3 Jones on Evidence, 1538. The discretionary power of the trial judge is to confine the cross-examination within reasonable limits. It does not include the authority to exclude altogether questions, and the answers thereto, which directly challenge the disinterestedness or credibility of the witness' testimony.

\* \* \* \* \*

"There is other evidence in the record against this defendant and the testimony as a whole, if believed and accepted by the jury, is amply sufficient to support a conviction. Even so, the error in denying defendant's counsel the right to cross-examine the witness Penn and the Solicitor of the Municipal Court in the respects indicated and to argue that the facts which would have been developed thereby materially affected Penn's credibility was prejudicial error, which entitles the defendant to a new trial."

Reversals similar to the one of which we have just taken notice resulted from like errors in several of the cases which are reviewed upon preceding pages of this opinion.

■ Without further analysis, we express our conclusion that assignment of error three possesses merit and that it must be sustained.

The question now occurs as to whether or not the judgment of conviction should be reversed. The answer to that inquiry must be found in ORS 138.230, which says:

"After hearing the appeal, the court shall give judgment, without regard to the decision of ques-

tions which were in the discretion of the court below or to technical errors, defects or exceptions which do not affect the substantial rights of the parties.''

■ Analysis set forth in preceding paragraphs shows that the ruling which is challenged by assignment of error number three, and which we held is erroneous, was not within ''the discretion of the court below.'' Accordingly, reversal cannot be withheld upon the phase of ORS 138.230 just quoted, but we must go on and determine whether the erroneous ruling was nothing more important than ''technical errors, defects or exceptions which do not affect the substantial rights of the parties.'' In making that determination, we are required, so it is held in *Frangos v. Edmunds et al.*, 179 Or 577, 173 P2d 596, to consider the entire record.

The record warrants the statement that the issue as to the defendant's guilt was a close one for the jury to determine. For example, the case was tried once before. The result of the first trial is indicated by an order which recites:

''* * * the jury reporting in open court to the Court that they are unable to agree on a verdict in this case * * * and it appearing to the Court that they have been deliberating on said case for approximately 9½ hours; and the Court being convinced from their statements that they are unable to agree

''It is hereby ordered that said jury be discharged * * *.''

The inability of the jury to agree after nine and one half hours of deliberation is cogent proof that the issue as to the defendant's guilt was a close one. That very fact cautions us to view with apprehension any ruling

which prevented the defendant from submitting to the jury admissible evidence.

As is manifest, Cunningham, Eldridge and Alfred Bailey were material witnesses for the state. When Alfred was called to the witness stand by the state, the district attorney asked him: "What is your address, Mr. Bailey?" and received the reply: "State Penitentiary." Before long the examination by the district attorney continued in this vein:

"Q Now, Mr. Bailey, have you entered any guilty plea to any charge brought by the State?

"A I pleaded guilty to obtaining money under false pretenses.

"Q Was that in connection with any one of these particular invoices?

"A Yes, sir.

"Q Did you receive a sentence on that charge?

"A Three years."

To that extent the state showed that Alfred Bailey had no motive to cultivate the good will of the prosecution and that he had no interest in the case except to tell the truth. In contrast to that situation, the defendant was prevented by an adverse ruling from probing Eldridge's motive, interest and fealty to the prosecutors.

We have observed that the authorities hold that a defendant should be permitted wide latitude in cross-examining an accomplice. We think that in this case it was especially essential that the defendant should have been permitted to pursue the course upon which he was about to enter when the erroneous ruling was made. The record reveals that Eldridge changed his testimony materially after the first trial. The following reveals one of the changes:

"Q Mr. Eldridge, you say that along about the 1st of September, 1953, Mr. Richard Bailey came back from the bank and told you that the bank was going to require evidence of shipment to accompany the Bill of Lading, is that right?

"A Someplace between the 1st and 15th, or someplace the first part of September.

"Q Well, now, you also testified, did you not, that someone said there in the presence of yourself and Mrs. Macy, Al Bailey, Paul Cunningham, that something had to be done, and you talked it over and you figured they'd have to attach fictitious Bills of Lading to invoices; and that there was no alternative; that Dick told Al to get busy and get orders from lumber dealers and so forth?

"A Yes, sir.

"Q Did that take place?

"A That's correct.

"Q When did you think about that part of this evidence here?

MR. COTTRELL: Your Honor, I will object to that question. It's immaterial when he thought about that.

THE COURT: Objection is overruled.

"Q (By Mr. Tooze) When did you think about that part of it, about the fictitious invoices?

THE COURT: He has the right to ask the witness when he thought of it.

THE WITNESS: What was that again?

"Q (By Mr. Tooze) When did you remember about the so-called fixing up fictitious Bills of Lading and this testimony about Al to call lumber dealers and get orders, when did you think about that for the first time?

"A Oh, possibly two or three days after the last trial as to what transpired.

"Q In other words, you didn't testify to that in the first trial, did you?

"A No, I didn't."

We will shortly resort to another part of his testimony which shows still another substantial change, but before doing so will give a brief explanation to indicate the importance of the change. During Eldridge's direct examination he had described a spindle which, he claimed, stood upon Cunningham's desk and which contained "duplicates of the fictitious invoices." According to his direct examination, the spindle was in plain view and a glance at it readily revealed the number of outstanding false invoices. He swore that at times the defendant consulted the spindle for the purpose of apprising himself of the extent to which the shipments lagged behind the advance invoicing. If he told the truth, the spindle played an important part in the operation of the fraudulent scheme. Upon cross-examination he testified:

"Q Now, when did you first remember that there was a spindle on the desk of Paul Cunningham for these slips representing the invoices that were ahead?

"A Oh, possibly a week or so, or just came to my mind as to what the spindle represented about a week or so after the last trial, and things that I didn't remember and it came to my mind and which I stated today.

"Q Did you have a meeting—did you attend a meeting at the District Attorney's office since the last trial?

"A Yes, sir.

"Q When was that?
"A Last night.

* * * * *

"Q And who was present at that meeting?
"A Last night?
"Q Yes.

"A Mr. Venn and Mr. Avrit and the other

gentleman, myself, Paul Cunningham and Al Bailey, and Mr.—

"Q The Deputy Sheriff?

"A Yes."

The above shows that upon the eve of the second trial Eldridge overhauled his testimony to a major extent. The changes which he made certainly were not of the kind that can be attributed to the frailties of memory or to the inability of a witness to express himself with precision; the changes were basic. The conclusion is inescapable that he uttered under oath falsehoods upon either the first or the second trial. By reverting to Eldridge's words above quoted, it will be noticed that he did not recall, so he swore, until after the first trial the defendant's alleged participation in the inception of the fraudulent scheme. When he recalled that fact—assuming the truth of his revamped testimony—he thereby gave the state's case vital support. His belated recollection of the facts went to the very heart of the case. Likewise, he had been unable to remember, so he further swore, until his parley with the prosecuting officers that a spindle stood upon Cunningham's desk and that it held the false invoices. After his session with the prosecutors he also remembered, according to his further account, not only the spindle, but also that the defendant consulted it occasionally for the purpose of ascertaining the extent to which production lagged behind false billing. The disputed spindle and its burden of false invoices played an important part in the trial.

Memory is the most important item of man's possessions which does not improve with the passage of time; it generally deteriorates. What, then, caused Eldridge to avow an ability, upon the second trial, to recall mo-

mentous facts which he had left unmentioned upon the first? In short, how does it happen that he made important transpositions of the facts? The situation demanded an explanation. The witness pointed to the night conference which occurred in the prosecutor's office immediately before the opening of the second trial as the fount at which his memory became refreshed. If in that office he secured his purported superior grasp of the facts, it was surely material to know whether he had been given a promise of immunity. Until the motive and the interest of this man, whatever they may have been, were disclosed to the triers of facts, a correct appraisal of the situation was impossible.

We add that Cunningham also confessed that after the first trial he made several alterations in his testimony. We have read his testimony with care; each alteration was upon a material phase of the case. In acknowledging that he made the changes, he declared that he did so after attending a session in the prosecutor's office the night before the second trial. It will be noticed that Alfred, the third witness who, like Cunningham and Eldridge, was surely an accomplice, likewise freely admitted that he altered his account of the wrongdoing. His first account, given both orally and in writing, exculpated the defendant.

It is true that the defendant's cross-examination of Cunningham and Eldridge developed the self-contradictions of which we have taken notice. Each witness impeached himself. But a party, in his efforts to discredit a witness, is not limited to a single attack. It is evident that, notwithstanding their self-impeachment, the jury accepted as truthful the testimony given by the two men upon the second trial. That fact presents the inquiry: Would the jury have rejected the testimony

given by Eldridge if the defendant had been permitted to show that no charge had been made against him and that he possessed a promise of immunity. The record submits no clear answer to that question, but it is evident that the changes in his testimony which Eldridge made following his session with the prosecuting officers may have tipped the scales sufficiently that, although the first trial had resulted in a hung jury, the second yielded a verdict of guilty. Any facts which attribute to a witness an evil motive and a self-seeking interest in the outcome of the case are material. It is reasonable to infer that, although a jury displayed a preference for testimony given in their presence upon a second trial over that given earlier before a different jury, they would have taken an opposite course had they learned that the recreant witness had bargained with the prosecutors for their own immunity.

From the foregoing we see that the erroneous rulings denied to the defendant opportunity to ascertain whether or not the prosecuting officers wielded a whip-hand over Eldridge.

The record affords no room for a belief that the jury had no alternative except to find that the defendant must have known that the employes in the Eugene office were preparing false invoices and bills of lading. We shall now take note of some of the evidence which indicates that he had no knowledge of the criminal practices.

We have mentioned the fact that when the fraud came to light Alfred accepted full responsibility for what had been done and absolved the defendant. It is true that he later claimed that the defendant had persuaded him to assume the blame, but it, nevertheless, is a fact that at the outset he acknowledged guilt and

acquitted the defendant. For example, in the paper which he prepared for the Mr. Gleason whom we have mentioned, he wrote with his own hand:

"At no time during this period did I discuss what I was doing with Dick as I thought that I was helping him—I did know many of the problems that he was facing trying to put mill on paying Basis.

"At all times I fully believed that the total amount of invoicing ahead could be covered by one weeks production—In fact I was under the impression that all could be shipped in a matter of three to five days."

Cunningham acknowledged that he had told the defendant's attorney that he (Cunningham) was unaware of anything which incriminated the defendant, and Eldridge admitted that he had made a similar statement to the defendant.

From the hour when the fraud came to light the defendant consistently maintained that he knew nothing whatever of the unlawful course of conduct. We have mentioned the fact that the state concedes that he wrote none of the false documents and that he presented none of them to the bank.

We shall review the incidents no further.

The conviction in this case rests largely upon the testimony of Alfred, Cunningham and Eldridge. All three of them, as we have seen, stand impeached through their own self-contradictions. The corroborating evidence consists largely of occasional statements which the defendant made after January 24, 1954; some, at least, are equivocal.

We are firmly convinced that it cannot be said that the defendant must have known of the fraudulent scheme which was inaugurated in the fall of 1953. A

juror could reasonably believe that he was unaware of it. That being true, the error disclosed by assignment of error three must be held prejudicial.

We have mentioned only two of the thirteen assignments of error. We do not believe that the eleven which remain unmentioned disclose any substantial irregularity.

The judgment of the circuit court is reversed. The cause is remanded.

On Respondent's Objections To Cost Bill

Eugene C. Venn, District Attorney, and Bruce R. Avrit and F. Gordon Cottrell, Deputy District Attorneys, Eugene, for the respondent.

Tooze, Kerr, Hill, Dougherty & Tooze and Jack H. Cairns, Portland, and Rodman & Rodman, Eugene, for appellant.

ROSSMAN, J.

This cause is again before us, this time upon objections presented by the state to two items in the cost bill filed by the successful appellant. The items are $496 and $222; they represent, respectively, the charges entered by the appellant for the printing of his opening brief and his reply brief. The former was 248 pages in length and the latter 111. The state does not challenge either charge in its entirety, although, if its challenges are completely sustained, each charge will be materially reduced. The state's objections to the two printing items are the following: (1) The headings, "Legal Propositions," "Points and Authorities," "Argument," and "Reply to Proposition I," etc., which precede the divisions into which the briefs were cast, were not printed in 12 point type (see Rule 15, Rules of the Supreme Court, which became Rule 26 under the revision of June 1, 1955) but in size 14. (2) The parts of the briefs which submitted the appellant's propositions and which constituted divisional headings were not spaced four lines to the inch (see the rule just cited) but 3.6 lines to the inch. (3) The appellant's briefs "used a full-bodied type face which expanded

the size'' of the briefs 30 pages. (4) The appellant's opening brief did not present merely the assignment of error which we sustained but also 12 others. (5) The appellant's briefs at places repeated statements. (6) The argument in behalf of the 12th assignment of error employed ''redundancies and repetitions.'' (7) Some assignments of error could have been consolidated.

The states' objections to the appellant's cost bill declare: ''While the body of appellant's opening and reply briefs are printed in 12 point type in accordance with Rule 15 of the Rules of the Supreme Court, appellant adopted and used a full-bodied type face which expanded the size of said briefs.'' Thus, the state acknowledges that the parts of the briefs which submitted the appellant's argument, as distinguished from other parts which consisted of captions or headlines, employed the required size type.

■ The aforementioned rule of this court says: ''Type used shall be 11 or 12 point spaced four lines to inch; excerpts and citations six lines to inch.'' A total of 72 lines of the opening and reply briefs, which constituted chapter and divisional headings, appear in 14 point type. Those 72 lines, therefore, exceeded the size premitted by our rules. The appellant's briefs were printed 24 lines to the page although an occasional page contains 25 lines. Accordingly, the 72 lines of 14 point type could be deemed the equivalent of three pages. When the challenged briefs were prepared, our rules entitled the successful party to enter in his cost bill a charge of $2.00 for each page of his brief. The state makes no claim that the appellant was not entitled to employ chapter headings. Those devices are often useful and enable the reader to grasp more readily the briefwriter's meaning. Therefore, the breach of our

rules did not consist of the use of captions but of printing them in oversize type. We do not know how much extra space was consumed when those 72 lines were set in 14 point instead of 12 point, but are satisfied that it was negligible and unworthy of retaxation of costs.

As we have seen, the state claims that parts of the appellant's opening brief were not spaced four lines to the inch as required by the rule previously quoted but "are spaced 3.6 lines to the inch." The objections enumerated, one by one, parts of 21 pages which, it is claimed, infract the rule. Each of the 21 pages submitted a short proposition printed 3.6 lines to the inch. Each proposition was followed immediately by supporting argument which was cast four lines to the inch. The total material upon those 21 pages which was spaced 3.6 lines to the inch aggregates 107 lines. The objections declare that "said lines occupy approximately five pages for the printing of which appellant claims $10 (5 pages at $2.00 per page)." A glance at the specified pages shows that in the printing of the 107 lines the pressman did not feel obliged to confine himself to four lines to the inch. The segregation of briefs into appropriate divisions, each of which is preceded by an apposite proposition which the succeeding argument seeks to maintain, is often a very useful way of presenting an appeal. The appellant's infraction, if any, of our rules did not consist of including in his brief the propositions upon which he depended, but in giving to each a little more space than the state believes was warranted. Unless a proposition is set apart slightly from the line above it and the one below, it may be engulfed in its surroundings and fail its purpose. Our rule of four lines to the inch was, obviously, intended to govern the printing of the

argument and not of such aids to ready grasp as headings and short propositions. Court rules cannot prescribe in detail every phase of brief printing without drawing themselves out into cumbersome length and occasionally unduly hampering a capable briefwriter. Whenever wastefulness or prodigal indications appear, this court will act. Nothing of that kind is rendered apparent by this phase of the state's objections.

■ We now proceed to the contention of the state that the appellant's brief "used a full-bodied type face" and thereby expanded its size 30 pages. Full-bodied type face increases slightly the horizontal space between words and thereby makes the page more readable. Very likely the state's contentions are correct that the length of a brief which employs that kind of material is expanded. However, this court has adopted no rule adverse to the use of full-bodied type face and, since we know of nothing wasteful about the appellant's briefs in that respect, this contention is rejected.

■ The fourth contention above stated is based upon the fact that the appellant's brief presented, not only the assignment of error which we sustained, but also twelve others. It is not essential to the taxation of costs for the printing of a brief that the appellant should divine the contentions which we later embrace and print nothing else. So far as we know, the appellant submitted all of his assignments of error in good faith and had confidence in the arguments which he tendered in their support.

■ The fifth contention directs attention to the fact that the appellant's opening brief in 17 places contains repetitious material. The state claims that an award to the appellant for printing should allow nothing for duplicate statements. The state computes the repeti-

tious material as ''a minimum of nine pages for which appellant claims $18.00 costs (9 pages at $2.00 per page).''

The contention which we just mentioned presents a difficult problem. Repetition is recognized as a legitimate tool of advocacy and in the hands of a capable writer is sometimes an effective means of advancing a cause. We have no right to deny a briefwriter any means of persuasion which advocacy places at his avail. Accordingly, we cannot rule that when a briefwriter has once made a statement he must never repeat it.

The appellant's opening brief, as the state's objections point out, contains 17 repetitions. We will now analyze them. In each of two instances repetition occurred when a quotation from an authority was later printed again in support of an analogous contention. In another place the opening brief quoted from a source this ejaculation, ''You can't do that. If you enter an order which gives a defendant his liberty, you can't take it away again.'' Later, by way of reinforcing the argument, the ejaculation was again printed. In still another instance repetition occurred in this manner: In complying with Rule 13 (3a) now Rule 16, the appellant followed his assignment of error with a quotation of the instruction given to the jury over his objections which was the subject matter of the assignment of error. Shortly, in arguing in behalf of his exception, a part of the instruction was repeated. We think that repetition in all of those four instances represented legitimate, useful argumentation. In the fourth instance, the repetition occurred through an effort to comply with our rules.

Each of the 13 remaining cases of repetition arose when the appellant, under the heading of Points and

Authorities, set forth propositions followed immediately with supporting citations and, next, under the heading of Argument, repeated verbatim the propositions and citations. In most places the points and authorities reoccurred under the heading of argument in exactly the same manner in which they had appeared under points and authorities without even being separated from one another by anything in the nature of argument. In other words, pure duplication occurred. When we analyzed the case prior to writing our decision we found that the repetition just described cast no light and did not promote convenience. Instead of serving a useful purpose it impeded our progress. We went back over the material at that time under an apprehension that the printer had inadvertently omitted something. The total of the duplicate material just described aggregates 116 lines, or approximately 4.8 pages. We do not believe that any allowance should be made for printing that material more than once.

 Next, the state claims that the appellant's brief employed "redundancies and repetitions" in presenting the argument in support of the 12th assignment of error, which was based upon the denial of a motion for a directed verdict. The appellant's brief devoted 56 pages to that assignment of error. The state's brief dwelled at corresponding length upon the same contention. We do not believe that the state's contention should be sustained.

 The final attack upon the cost bill contends that the appellant, in violation of Rule 13 (3 a) now Rule 16, failed to consolidate assignments of error which presented the same legal question. Especially in criminal cases much discretion must be left to appellant's counsel in phrasing, aiming and marshaling his claims of error. Two challenged rulings may be gov-

erned by the same principle of law, but the exceptions, saved by counsel, may be sufficiently different to warrant separate treatment of the rulings. We know of no reason for believing that the appellant, in presenting his assignments of error, acted in bad faith, and the situation affords no basis for a belief that if the assignments of error had been consolidated into a fewer number printing would have been materially lessened in volume. We disallow this objection to the cost bill.

The goal which the rules under consideration seek to attain is the preparation of effective briefs which present in an enlightening manner the contentions of the parties. We think that the briefs which were filed in this case, both by the appellant and the state, were among the best that have come to our hands in recent years in criminal cases. The state's brief was apparently printed by a pressman who was intimately familiar with our rules, yet when it is examined with critical care an occasional violation of our rules, which added a little to length, can be found. The situation indicates that getting a brief through the printshop is a very practical matter and that our rules should not be viewed as mandates but rather as guides. We must at times be prepared to accept something less than perfection, for, if we demand meticulous compliance with the rules, every case in which costs are taxed will result in a painstaking examination by losing counsel of the winning brief and then of the filing of exhaustive objections. Thus, every case will yield a satellite case. That is a result which must be avoided.

The objections are sustained to the extent of $9.60 (4.8 x $2). The clerk will retax the costs.